**STORER CABLE COMMUNICATIONS, et al., Plaintiffs,**

v.

**The CITY OF MONTGOMERY, ALABAMA, et al., Defendants.**

Civ. A. No. 90–T–958–N.

United States District Court, M.D. Alabama, N.D.

Oct. 9, 1992.

1522

**1524**

Robert A. Huffaker, Montgomery, Ala., Terry S. Beinstock, James Cunningham, Jr., Miami, Fla., for plaintiffs.

Solomon Seay, Montgomery, Ala., John J. Dalton, June Kirkland, Richard Ford, Alan Shor, James Lamberth, Ralph Greil, Atlanta, Ga., for TNT.

Maury D. Smith, W. Joseph McCorkle, Montgomery, Ala., for City defendants.

Don Siegelman, Stephen Dodd, Mary Culberson, Montgomery, Ala., for State of Ala.

Susan Russ, Bradley Byrne, Tyrone Means, Montgomery, Ala., for MCE.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Several cable television companies have brought this lawsuit challenging the legality of two municipal ordinances, 9–90 and 48–90, enacted by the City of Montgomery, Alabama. Plaintiffs Storer Cable Communications, ESPN, Inc., Satellite Services, Inc., and Turner Network Television contend that the ordinances contravene a number of federal constitutional provisions and statutes as well as Alabama law. They seek declaratory, injunctive, and monetary relief. Jurisdiction is premised on federal-question jurisdiction, 28 U.S.C.A. §§ 1331, 1343, and the doctrine of pendent jurisdiction. The defendants are the City of Montgomery and its mayor; the State of Alabama; and Montgomery Cablevision and Entertainment, Inc., a local cable television operator.

This cause is now before the court on the parties' various motions for summary judgment. For the reasons which follow, the motions will be granted in part and denied in part.

## I. BACKGROUND

In June of 1976, the City of Montgomery passed Ordinance 50–76 and took its first step in regulating the provision of cable television services within the city. The or-

dinance requires a cable television operator first to obtain a franchise granted by the city before constructing, operating, or maintaining a cable television system. According to Ordinance 50–76, "no amendment substantially amending the existing rights and obligations of the Grantee shall be adopted without the Grantee's consent." The ordinance also declares that a grantee is at all times "subject to the lawful exercise of the City's police power ... and such reasonable regulations as the City Council may subsequently promulgate thereunder." Finally, the ordinance provides that "No rate established shall afford any undue preference or advantage among subscribers, but separate rates may be established for separate classes of subscribers and rates may reflect the increased cost of providing service to isolated or sparsely populated areas."

In October 1976, the city granted its first cable television franchise, to Storer Cable.[1] Since obtaining its franchise, Storer Cable has established a cable system in the city and provides cable programming to the city's residents. The company provides "basic" cable programming to subscribers for a monthly fee.[2] Customers may also select to receive additional programming at extra costs. The basic service includes not only the transmission of local and distant television signals but also special cable programs obtained from various cable television "programmers" such as ESPN and Turner Network. Additionally, Storer Cable purchases some programming through intermediates, such as Satellite Services, who have acquired the distribution rights from the various programmers. Storer Cable obtains much of its cable programming through exclusive contracts. For example, the company has exclusive programming contracts with ESPN (for its NFL Football Package), CNBC, Sport–South, and Turner Network. These contracts provide that Storer Cable has the sole rights to transmit designated programming to Montgomery consumers.

For almost 15 years, Storer Cable was the only cable franchisee in Montgomery. In December of 1989, a number of other local citizens incorporated a new cable company, Montgomery Cablevision, to compete with Storer Cable. In early 1990, Montgomery Cablevision applied to the city for a cable franchise. Eventually, in March of 1990, the company was granted a franchise by the city, but during and directly after the consideration process the city passed the two cable regulations, Ordinances 9–90 and 48–90, which are the subject of this litigation. The relevant texts of the ordinances are set out in the margin below.[3]

---

1. The franchise agreement between Storer Cable and the City of Montgomery is Ordinance 101–76. In 1989, by virtue of Ordinance 67–89, the franchise was extended through the year 2006.

2. Basic cable service is defined as "any service tier which includes the retransmission of local television broadcast signals." 47 U.S.C.A. § 522(2). "Any service tier which is separately offered and does not include the retransmission of local broadcast signals is not basic cable service." H.R.Rep. No. 934, 98th Cong., 2d Sess. 40, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4677.

3. The relevant portions of Ordinance 9–90, enacted on January 16, 1990, which re-enact the following parts of Ordinance 50–76, but add the underlined language, are as follows:
"Section 5. Limitations of Franchise.

· · · · ·

(2) A grantee shall, at all times during the life of its franchise, be subject to the lawful exercise of the city's police power, strictly adhere to the City laws and ordinances, and such reasonable regulations as the City Coun-

cil may subsequently promulgate thereunder. *No franchise issued pursuant to the provisions of this Ordinance shall be deemed, expressly or impliedly, to authorize the grantee to utilize its cable television system to provide any service in such a manner as to unlawfully damage any business competitor or other third party or violate any statutes or regulations of the United States or the State of Alabama. Nor shall any grantee, by act or omission, engage in any anticompetitive practice in violation of any statutes or regulations of the United States or the State of Alabama. The provisions of this section shall ·be enforceable in courts of competent jurisdiction against a grantee by any party who alleges injury as a result of an alleged violation thereof....*
"Section 14. Rates Charged to Subscribers.

· · · · ·

(3) No rate established shall afford any undue preference or advantage among subscribers, but separate rates may be established for separate classes of subscribers and rates may reflect the increased cost of providing service to isolated or sparsely populated areas. *In no*

Ordinance 9–90 on its face adds to the original anti-price discrimination language of Ordinance 50–76 the following sentence: "In no event shall rates be established so low for any class of subscriber or for any geographic location as to prevent, discour-

age, restrict, or diminish competition in the furnishing of cable services." The disputed parts of Ordinance 48–90 are §§ 3 through 7. Section 3 appears to be an antitrust provision and generally prohibits cable television exhibitors, distributors and

*event shall rates be established so low for any class of subscriber or for any geographic location as to prevent, discourage, restrict, or diminish competition in the furnishing of cable services."*

Ordinance 48–90 was enacted on August 22, 1990. The ordinance in its entirety reads as follows:

"AN ORDINANCE OF THE CITY OF MONTGOMERY, ALABAMA, TO PROMOTE COMPETITION IN THE PROVISION OF CABLE TELEVISION SERVICES

"Section 1. PURPOSE

This ordinance is hereby adopted to promote and insure free and open competition among corporations or persons franchised under City Ordinance 50–76 to operate cable television systems and to provide cable television service to the citizens of Montgomery.

"Section 2. DEFINITIONS

'Cable television exhibitor' or 'Cable television operator' or 'cable operator' means any person or group of persons who provides cable service over a cable television system and directly or through one or more affiliates owns a significant interest in such cable system, or who otherwise controls or is responsible for, through any arrangement, the management or operation of such a cable system.

'Cable television distributor' or 'cable television program supplier' means any person or group of persons that leases, licenses or sells program material or program services used in the provision of cable television service by a cable television exhibitor.

'Grantee' is a holder of a cable television franchise issued by the City of Montgomery.

The terms 'combine' or 'contract' shall include affiliation of a cable television exhibitor or cable television operator with a cable television program supplier.

"Section 3. RESTRAINT OF TRADE IN PROGRAM MATERIAL OR PROGRAM SERVICES USED IN THE PROVISION OF CABLE TELEVISION SERVICE

It shall be unlawful for a cable television exhibitor providing or intending to provide cable service within the City to restrain, or attempt to restrain the freedom of trade or production, or to monopolize, or attempt to monopolize the production, control or sale of program material or program services used in the provision of cable television service within the City.

It shall be unlawful for a cable television distributor or cable television program supplier to restrain, or attempt to restrain the freedom of trade or production, or to monopolize, or attempt to monopolize the production, con-

trol or sale of material or program services used in the provision of cable television service within the City.

"Section 4. CONTRACTING OR COMBINING TO FIX OR LIMIT PROGRAM MATERIAL OR PROGRAM SERVICES USED IN THE PROVISION OF CABLE TELEVISION SERVICE

It shall be unlawful for a cable television exhibitor providing or intending to provide cable television service within the City to contract or combine with any other person to fix or limit the lease, license, sale or exchange, or to require or to provide for any other person to discriminate against a grantee with respect to the lease, license, sale or exchange of program material or program services used in the provision of cable television service where the purpose *or* effect of such contract, combination or discrimination is or may be to tend to create a monopoly or to injure, destroy, inhibit, prevent or lessen substantially competition with respect to the provision or cable television service within the City.

"Section 5. VIOLATION IS GROUNDS FOR FRANCHISE TERMINATION

A violation by a grantee of any of the provisions of this ordinance shall be grounds for terminating the franchise of the violator.

"Section 6. ENFORCEMENT BY JUDICIAL ACTION

The provisions of this ordinance may be enforced in an action brought by the City, an affected grantee or an affected subscriber of cable services within the City in a court of competent jurisdiction seeking declarative, injunctive or monetary relief, including punitive or exemplary damages, as may be found appropriate, plus reasonable attorneys fees when the plaintiff secures affirmative relief whether by way of damages or declaratory or injunctive relief.

"Section 7. PRESUMPTION OF INTENT IN ACTION TO ENFORCE

In all actions brought under this ordinance, proof of one or more proscribed acts is presumptive evidence or [sic] the purpose or intent to injure competitors or to diminish, eliminate, inhibit or prevent competition.

"Section 8. SEPARABILITY

Should any section, subsection, sentence, clause, phrase, or portion of this ordinance for any reason be held invalid or unconstitutional be [sic] any court of competent jurisdiction, such provision shall be deemed a separate, distinct and independent provision and such holdings shall not affect the validity of the remaining provisions herein."

program suppliers from monopolizing or restraining trade in the area of cable television programming or services and from attempting to do so. Section 4 targets specific types of licensing activity by making it unlawful for cable television exhibitors, distributors and program suppliers to conspire to fix or limit the sale or licensing of cable program material or services, or to discriminate against another grantee with respect to such sales or licensing "where the purpose or effect of such ... combination ... is or may be to tend to create a monopoly or to injure, destroy, inhibit, prevent or lessen substantially competition with respect to the provision of cable television service within the City." Section 5 allows the city to terminate the franchise of a grantee should the grantee violate the provisions of ordinance, and § 6 gives injured parties a private right of action for legal and equitable relief. Finally, § 7 of the ordinance provides that, in all actions brought under the ordinance, proof of any one proscribed act creates a presumption that the defendant had the purpose or intent to inhibit, diminish, eliminate, or prevent competition.

In May 1990, prior to the passage of Ordinance 48–90, Montgomery Cablevision wrote to both Turner Network and ESPN demanding that the companies provide it with certain programming which they were licensing to Storer Cable on an exclusive basis in the Montgomery area. Turner Network and ESPN both refused. In September 1990, the plaintiffs—Storer Cable, ESPN, Satellite Services, and Turner Network—brought this lawsuit against the City of Montgomery and its mayor, claiming that the new laws—Ordinances 9–90 and 48–90—violate the United States Constitution, federal law, and Alabama law. Montgomery Cablevision and the State of Alabama intervened as defendants, and Montgomery Cablevision filed a counterclaim charging the plaintiffs with violations of the Sherman Act, 15 U.S.C.A. §§ 1, 2 and Ordinance 48–90 §§ 3, 4. All parties have now moved for summary judgment on most of the issues raised.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judg-ment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judg-ment as a matter of law." A district court must consider "all the evidence in the light most favorable to the non-moving party ... and resolve all reasonable doubts in favor of the non-moving party." *Earley v. Champion International Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990) (citations omit-ted).

Although the parties essentially agree on the facts underlying this case, important disputed issues have been raised concerning the two ordinances, namely their intended purpose, their proper interpretation, and their impact on the provision of cable services and programming in Montgomery. These issues are discussed in detail below in relation to the arguments advanced by the parties. For the sake of a general understanding of the dispute, however, a few points will be made at this juncture.

First, the parties disagree over what the city's purposes were in enacting the two ordinances and whether those purposes are legitimate. The plaintiffs point to the circumstances surrounding the enactment of the ordinances, including the city counsel's discussions of the ordinances during their deliberations, as support for their position that the ordinances were passed specifical-ly for the benefit of Montgomery Cablevi-sion—to help the local cable company com-pete against Storer Cable by negating the latter's competitive advantages. Those ad-vantages would include Storer Cable's ex-clusive programming licensing arrange-ments and purported ability to undercut Montgomery Cablevision's pricing. The de-fendants, in contrast, rely on the ordi-nances' statements of purpose and general language as support for the contention that the enactments are neither intended to tar-get the plaintiffs per se, nor to benefit Montgomery Cablevision. The defendants maintain that the ordinances' overarching purpose is to benefit the public by promot-ing competition in the local cable industry by prohibiting anti-competitive practices.

As a second and related matter, the par-ties disagree as to what conduct the ordi-

nances prohibit. The plaintiffs, in some portions of their briefs, contend that both ordinances are unconstitutionally vague and thus give no reasonable notice of the scope of their prohibitions. Alternatively, the plaintiffs read §§ 3, 4, and 7 of Ordinance 48–90 as combining to require programmers to license their programming to all comers and as banning all exclusive licensing agreements between cable exhibitors and suppliers or distributors for the provision of cable programming, or at least as prohibiting the exclusive agreements between the plaintiffs in this case. The defendants, on the other hand, agree that Ordinance 48–90 bans the agreements at issue, but deny that the ordinance is a per se ban on exclusive licensing. Instead, they contend that the law is akin to an antitrust regulation and prohibits only those arrangements tainted by an anti-competitive purpose or effect.

With regard to Ordinance 9–90, the parties' positions are more in line. The plaintiffs' position is that the ordinance prohibits grantees from decreasing their subscriber rates in the parts of the city where competition is present, thereby mandating that they charge uniform rates throughout the city. More specifically, Storer Cable contends that the two sentences of § 14(3) of the ordinance combine to prevent them from competing on a price basis with Montgomery Cablevision in those areas of the city which both companies serve. The defendants assign to Ordinance 9–90 two operative effects. They maintain that the first sentence of § 14(3) is akin to an "anti-redlining" provision in that it prevents price discrimination among subscribers based on impermissible factors. The second sentence of § 14(3) is, according to the defendants, an antitrust regulation that prohibits predatory pricing, that is, pricing that is temporarily set so low so as to drive a competitor out of business or to discourage a potential competitor to enter the market. The defendants admit that the second sentence of § 14(3) would prohibit not only predatory pricing targeted at a specific geographic area within the city, but also pricing schemes which apply uniformly throughout Montgomery.

Third and finally, the parties sharply disagree as to the effects these ordinances will have on the local cable industry. The plaintiffs take the position that these ordinances will drive Storer Cable from the Montgomery market by systematically crippling its competitive advantages and will discourage programmers from offering their exclusive programs to any exhibitors in Montgomery, lest they be forced under Ordinance 48–90 to supply them to all. According to the defendants, the ordinances will open up the Montgomery cable market to free and vigorous competition by curtailing what they consider to be anti-competitive abuses employed by cable providers who can leverage their market power. The defendants contend that it is these practices—exclusive programming licensing agreements, discriminatory pricing, and predatory pricing—not the ordinances, which will drive enterprising cable providers from the Montgomery market or discourage them from entering the market in the first place.

## II. JURISDICTION AND RELATED MATTERS

### A. Federal–Question Jurisdiction

■ Before considering the merits of the claims and defenses presented, the court must determine whether it has subject-matter jurisdiction to hear this action. Although none of the parties has raised the jurisdictional issue, the court must still address it; subject-matter jurisdiction may not be conferred upon a court by consent. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). Whenever there is an indication that jurisdiction may be lacking, the court must satisfy itself that jurisdiction is proper. *Id.*

■ In this case, the plaintiffs contend that various provisions of Ordinances 9–90 and 48–90 contravene the United States Constitution in that they violate the first amendment, the due process and equal protection clauses of the fourteenth amendment, the impairment of the contracts

clause, and the commerce clause. The plaintiffs also claim that sections of the ordinances are preempted by the Copyright Act, 17 U.S.C.A. §§ 101, *et seq.*, the Cable Communications Policy Act of 1984, 47 U.S.C.A. §§ 521, *et seq.*, and the Trademark Act, more popularly known as the "Lanham Act," 15 U.S.C.A. §§ 1051, *et seq.*, and that, under Alabama law, the ordinances breach the plaintiffs' franchise agreements with the city, violate state-law prohibitions against the impairment of contracts, and are beyond the scope of the city's regulatory authority.

The plaintiffs bring their federal constitutional claims under 42 U.S.C.A. § 1983 and directly under the Constitution and, accordingly, invoke this court's federal-question jurisdiction under 28 U.S.C.A. §§ 1331, 1343. It is well settled that § 1983 provides a cause of action against municipalities for alleged violations of the first amendment, the contracts clause, and both the equal protection and due process clauses. *Collins v. City of Harker Heights,* — U.S. —, —, 112 S.Ct. 1061, 1065–66, 117 L.Ed.2d 261 (1992); *E & E Hauling, Inc. v. Forest Preserve Dist. of Du Page County,* 613 F.2d 675, 678 (7th Cir.1980). Additionally, the Supreme Court recently held that suits for violations of the commerce clause may also be brought under § 1983, resolving a division of authority on that question. *Dennis v. Higgins,* 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991). Therefore, because the plaintiffs' constitutional claims are cognizable under § 1983, jurisdiction under §§ 1331 and 1343 is proper for these claims.

Federal-question jurisdiction over the plaintiffs' preemption claims is also proper, but the route to this conclusion is slightly more circuitous. Ordinarily, federal preemption is a federal defense to a state-law suit, and, as such, it does not create federal-question jurisdiction. *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). The plaintiffs seem to be bringing their preemption claims directly under the federal statutes upon whose preemptive force they rely, the Copyright Act, the Ca-

ble Act, and the Lanham Act. However, they have not made the argument that these statutes provide private causes of action in federal court—either under the statutes themselves or under § 1983—to enjoin state or local laws claimed to be inconsistent with their provisions. Comfort also cannot be found in the supremacy clause itself, the constitutional provision which underlies all federal preemption controversies, because the supremacy clause does not confer any "right" within the meaning of § 1983. *Dennis,* 498 U.S. at —, 111 S.Ct. at 872; *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

However, the Supreme Court has held that federal courts have jurisdiction to entertain suits to enjoin state officials from interfering with federal statutory rights. The Court has written:

"It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *Ex parte Young,* 209 U.S. 123, 160–62, 28 S.Ct. 441, 454–55, 52 L.Ed. 714 (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.... This Court, of course, frequently has resolved preemption disputes in a similar jurisdictional posture."

*Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983) (citations omitted). *See also* 1 Moore's Federal Practice ¶ 0.65 [2–1] p. 700.93 to 700.94 (1992) ("[*Ex Parte Young* ] can be read, therefore, as standing for the proposition that an action to enjoin an officer from violating the constitution by his official acts states a claim arising under the constitution for the purposes of § 1331"). The Court has also held that, once jurisdiction is properly established over the action for injunctive relief, the separate remedy available through a declaratory judgment may also be asserted

before the federal court. *Franchise Tax Bd. v. Const. Laborers Vac. Trust*, 463 U.S. 1, 20 n. 20, 103 S.Ct. 2841, 2850–51 n. 20, 77 L.Ed.2d 420 (1983); *see also Gay Student Services v. Texas A & M Univ.*, 612 F.2d 160, 166 (5th Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495. Interestingly, the Supreme Court in these cases seemed to be operating on the assumption that the plaintiff has a valid federal cause of action, an issue analytically distinct from the issue of jurisdiction, although the Court has never identified the precise source of the plaintiff's claim in these kinds of preemption disputes. Most commentators have concluded that such causes of action arise directly under the Constitution, *see, e.g.*, A. Althouse, *When to Believe a Legal Fiction: Federal Interests and the Eleventh Amendment*, 40 Hastings L.J. 1123 (1989); 13B C. Wright, Federal Practice & Procedure § 3566 p. 102 (1984) ("The best explanation of *Ex Parte Young* and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal constitution or laws"), and at least one court has found that such claims are cognizable under § 1983, *Playboy Enterprises v. Public Service Com'n*, 906 F.2d 25, 31–33 (1st Cir.), *cert. denied*, 498 U.S. 959, 111 S.Ct. 388, 112 L.Ed.2d 399 (1990). In any event, the Supreme Court has not questioned the propriety of these types of claims even when the federal statute whose preemptive power is at issue cannot be the source of the plaintiff's cause of action. *See id.*

On the basis of this authority, this court holds that it has subject-matter jurisdiction over all of the plaintiffs' federal claims. Additionally, because the plaintiffs' state-law claims turn on the same set of facts as do the federal claims, the court's pendent jurisdiction has been properly invoked. *United Mineworkers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

**B. Eleventh Amendment**

■ The defendants raise the eleventh amendment as a jurisdictional bar to the plaintiffs' state law grounds for relief. As the defendants correctly note, the eleventh amendment forbids federal courts from entertaining claims predicated on state law when they are brought against the state itself. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). However, eleventh-amendment immunity does not apply to municipalities or their officials, such as the City of Montgomery and the city's mayor. *Robinson v. Georgia Dept. of Transportation*, 966 F.2d 637, 638 (11th Cir. 1992); *Schopler v. Bliss*, 903 F.2d 1373, 1378 (11th Cir.1990). Although the State of Alabama has been granted defendant-intervenor status, there is no dispute that the requested relief would run solely against municipal officials and would have no impact on the state itself. *See Pennhurst*, 465 U.S. at 123–24, 104 S.Ct. at 920–21. For these reasons, the eleventh amendment is no barrier to the plaintiffs' claims.

### III. FEDERAL PREEMPTION ISSUES

■ The general framework for determining whether a federal statutory scheme preempts a state or local law is by now familiar.[4] "The Supremacy Clause, U.S. Const., Art VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County, Fla. v. Auto. Med. Labs.*, 471 U.S. 707, 712–13, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). In determining the preemptive scope of a federal law, the court's underlying task is to discern and effectuate Congress's intent. *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (" '[t]he purpose of congress is the ultimate touchstone' of preemption analysis") (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978)). The Supreme

---

**4.** Preemption analysis is same whether it is a state law or local ordinance which is being subjected to scrutiny. *Hillsborough County, Fla. v. Auto. Med. Labs.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).

Court has cautioned, however, that the striking down of state laws on preemption grounds is generally disfavored. "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' " *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)) (alterations in original). Therefore, courts should proceed on "the conviction that the proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted." *Merrill Lynch, Pierce Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 127, 94 S.Ct. 383, 389–90, 38 L.Ed.2d 348 (1973).

■■■■ The Supreme Court has recognized three circumstances under which a state law will be regarded as having been preempted by federal law. The first is when Congress itself has spoken by providing "express" preemption language. *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375. Second, when a statute contains no express preemptive language but the relevant scheme of federal regulation is "so comprehensive as to make reasonable the inference that Congress left no room for the States to supplement it," the court should deem that Congress intended to preempt the whole field of state law by "implication." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. at 230, 67 S.Ct. at 1152; *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375. Third and finally, "conflict" preemption occurs when either compliance with both a federal and state regulation is impossible or the state law in question "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61

S.Ct. 399, 404, 85 L.Ed. 581 (1941)). In such circumstances, the supremacy clause demands that it is the state law which must give way.

### A. Copyright Act Preemption

The plaintiffs contend that Ordinance 48–90 deprives them of rights protected by the Copyright Act, 17 U.S.C.A. §§ 101, *et seq.* They contend that the ordinance is preempted under all three theories of preemption: express, implied, and conflict. The court holds that only § 7 of the ordinance, to the extent the section raises a presumption that exclusive licensing contracts are illegal, is preempted, both expressly by the act's preemption clause and because it irreconcilably conflicts with the federal copyright scheme.

■■■■ The copyright clause of the United States Constitution,[5] although giving Congress the power to establish a national copyright scheme and even to occupy the entire copyright field, does not, of its own force, displace state law.[6] *Goldstein v. California,* 412 U.S. 546, 559–60, 93 S.Ct. 2303, 2311–12, 37 L.Ed.2d 163 (1973). Therefore, until the 1976 amendments to the Copyright Act, state-law copyright schemes were permitted. *See Id.* The 1976 amendments eliminated dual copyright systems and provided for the express preemption of state copyright laws or their equivalents. The current § 301 of the act provides:

"(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by Sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed

---

5. Article I, § 8, cl. 8, the copyright clause, provides that Congress shall have the power to: "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writing and Discoveries...."

6. For this reason, the plaintiffs' assertion that Ordinance 48–90 is preempted directly by the copyright clause itself must be rejected.

exclusively by this title. Thereafter no person is entitled to any such right or equivalent in any such work under the common law or statutes of any state." 17 U.S.C.A. § 301(a).[7] Section 301 establishes a two-step test for preemption: a state law will be subject to preemption if (1) it creates or grants rights that are "equivalent" to any of the exclusive rights within the general scope of copyright rights granted by § 106 of the Copyright Act, and (2) those rights may be claimed in works which are the subject matter of copyright as set forth in §§ 102 and 103. *Crow v. Wainwright*, 720 F.2d 1224, 1225 (11th Cir.1983), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 35 (1984); *Allied Artists Pictures Corp. v. Rhodes*, 496 F.Supp. 408, 443 (S.D.Ohio 1980), *aff'd in part, rem'd in part*, 679 F.2d 656 (6th Cir.1982); 1 *Nimmer on Copyright* § 1.01[B] at 1–10 (1990). The rights provided to a copyright owner by § 106 are the exclusive rights to do and to authorize (1) the reproduction of the copyrighted work, (2) the preparation of derivative works based on the copyrighted work, (3) the distribution of copies of the copyrighted work to the public by sale or other transfer of ownership or by rental, lease or loan, and (4) the public performance of the copyrighted work, in the case of audiovisual work. *Donald Frederick Evans & Assoc., Inc. v. Continental Homes*, 785 F.2d 897, 914 (11th Cir.1986); *see also* 17 U.S.C.A. § 106. Therefore, a state-law right is equivalent to one of the exclusive copyright rights if it is infringed by the mere act of reproduction, performance, distribution, or display of a work, or preparation of a derivative work, which is within the subject matter of copyright. If other meaningful elements are required to establish a violation of the state-law right, how-ever, then the law is not preempted. *Donald Frederick Evans*, 785 F.2d at 914.

The most common application of this rule arises when a party is subject to state-created liability simply for making an unsanctioned duplication of another's work product (when that work product, whether copyrighted or not, is within the subject matter of copyright). *G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 904 (9th Cir.1992). For example, in *Crow*, a defendant was charged under a state criminal statute which prohibited dealing in stolen property. The "stolen" property had not been physically taken from the owner. The defendant was, instead, selling unauthorized copies of copyrighted music, that is, "bootleg" tapes. The Eleventh Circuit Court of Appeals held that § 301 preempted the state's prosecution because, even though a showing of scienter was required under the state criminal statute, "the elements essential to establish a violation of the Florida statute in this case correspond almost exactly to those of the tort of copyright infringement." 720 F.2d at 1226.

In this vein, courts have held that state-law unfair competition or deceptive trade practice causes of action arising out of unauthorized appropriations of work product will survive preemption only if the plaintiff is required to establish an extra element, such as likelihood of customer confusion, misrepresentation, or deception, *see, e.g., Valente–Kritzer Video v. Pinckney*, 881 F.2d 772, 776 (9th Cir.1989) (fraud), *cert. denied*, 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *Donald Frederick Evans*, 785 F.2d at 914 (unfair competition claim); *Ehat v. Tanner*, 780 F.2d 876 (10th Cir.1985) (misappropriation),

---

**7.** The legislative history serves to clarify Congress's preemptive intentions:

"The intention of section 301 is to preempt and abolish any rights under the common law or statutes of a state that are equivalent to copyright and that extend to works coming within the scope of the federal copyright law. The declaration of this principle in section 301 is intended to be stated in the clearest and most unequivocal way possible, so as to foreclose any possible misinterpretation of its un-qualified intention that Congress should act preemptively, and to avoid the development of any vague borderline area as between State and Federal protection."

*Crow v. Wainwright*, 720 F.2d 1224, 1225 (11th Cir.1983) (quoting H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 130 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5746), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 35 (1984).

*cert. denied,* 479 U.S. 820, 107 S.Ct. 86, 93 L.Ed.2d 39 (1986), and actions for reputation injury will also be preempted if the actions are based merely on a defendant's publication of another's work product. *Ehat,* 780 F.2d at 879; 1 *Nimmer on Copyright* § 1.01[B] at 1–16.2 to 1–19 (1990).

The plaintiffs' argument that Ordinance 48–90 is preempted by § 301 proceeds as follows. Much of the programming transmitted by the plaintiff programmers is copyrighted, and Storer Cable, by virtue of exclusive licensing contracts with the copyright holders, has the exclusive right to provide this programming to the viewers of Montgomery. Ordinance 48–90, according to the plaintiffs, amounts to a per se ban of exclusive licensing agreements for the provision of cable programming and applies to all programming, copyrighted or not. Proceeding from these premises, the plaintiffs conclude that the two-step test for copyright preemption enunciated in *Crow* is satisfied because (1) a right is created by Ordinance 48–90 which is equivalent to one of the exclusive rights protected by the Copyright Act and (2) the right affects materials which are within the subject matter of the act.

The plaintiffs' second contention, that "the subject matter of copyright" is implicated by Ordinance 48–90, is not controverted and is admitted by the defendants. Both sides agree that the programming at issue is copyrighted, and both sides agree that, by obtaining a copyright in an audiovisual work, the owner acquires the right to grant an exclusive or restrictive license to another to exhibit it as well as the companion right to prohibit others from doing the same, *Interstate Circuit v. United States,* 306 U.S. 208, 227, 59 S.Ct. 467, 475, 83 L.Ed. 610 (1939) ("Under § 1 of the Copyright Act ... the owners of the copyright of a motion picture film acquire the right to exhibit the picture and to grant an exclusive or restrictive license to others to exhibit it"); *MacLean Assoc., Inc. v. Wm. M.*

*Mercer–Meidinger–Hansen, Inc.,* 952 F.2d 769, 778 (3rd Cir.1991) ("the owner of a copyright can transfer ownership of the copyright by selling it or by exclusively licensing it"); *see also Donald Frederick Evans,* 785 F.2d at 914; *Allied Artists,* 496 F.Supp. at 4433, a right which may be restricted if Ordinance 48–90 is applied to copyrighted programming.[8]

It is in applying the first element of the test, the "equivalency" factor, that things become complicated. The confusion arises because the plaintiffs are not contending that Ordinance 48–90 *establishes* some form of state-law exclusive right in a work which would give an owner a cause of action against copying made without consent. This contention would fit easily into the § 301 analysis discussed above. Instead, the plaintiffs argue that the ordinance *destroys* one of the rights granted to them by federal copyright laws, namely the right to engage in the exclusive licensing of copyrighted materials. This is essentially a classic "conflict" preemption argument, that Ordinance 48–90 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)), by prohibiting activity which is protected and even encouraged by the federal copyright laws. Such claims have been analyzed as "conflict" cases prior to the addition of § 301. *See e.g., United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *Watson v. Buck,* 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941); *Interstate Circuit, supra; Fox Film Corp. v. Doyal,* 286 U.S. 123, 52 S.Ct. 546, 76 L.Ed. 1010 (1932).

However, the addition of the express preemption clause to the Copyright Act has changed the rules somewhat. There is authority that suggests that conflict preemption analysis is not appropriate when legis-

---

**8.** The defendants do not deny that "contract[ing] or combin[ing] with any other person to fix or limit the lease, license, sale or exchange ... of program material or program services used in the provision of cable television service," includes the exclusive licensing of copyrighted programming.

lation, such as the Copyright Act, contains an express preemption clause.[9] Were this court writing on a clean state without the act, then it would most likely undertake a conflict preemption analysis rather than attempting to apply § 301 to this case. As the parties' briefs have made apparent, this type of claim does not easily fit into the § 301 analytical mold. Section 301, as discussed above, is concerned with eliminating supplemental state-law causes of action which "look" like copyright infringement actions. There is little indication that § 301 was intended to apply to state police-power regulations that have the effect of limiting a copyright holder's ability to exhibit or profit from its protected work.

Fortunately, the court need not resolve this difficult issue. In this case, the result under both § 301 and "conflict" analyses turns on an identical factor and, as a result, the court reaches the same conclusion under either route. It is agreed that, under § 301's equivalency analysis, the plaintiffs must identify a right created by Ordinance 48–90 and must demonstrate how this right is equivalent to those protected by copyright. The plaintiffs point out that the ordinance creates a "right" vesting not in a potential copyright holder but in the city or a competing franchiser. This right is a cause of action under the ordinance, and, as asserted against the plaintiffs in this case, it is a right not to be damaged by an exclusive programming license whose purpose or effect is or may tend to lessen competition in the city's cable services. According to the authorities discussed above, the right created by Ordinance 48–90 is "equivalent" to copyright if it is infringed by the plaintiffs' mere act of exclusive distribution of copyrightable material and would survive scrutiny if it could only be violated upon proof of an "extra" element, an element which would render the conduct prohibited by the ordinance meaningfully different from core copyright-protected activity. The defendants contend that this extra element is the ordinance's additional requirement that the challenged conduct *restrain trade in violation of legitimate antitrust laws.* Under the seemingly unrelated conflict preemption analysis, the critical issue is whether the challenged law destroys or unduly burdens rights protected by the Copyright Act. *See Sperry v. Florida ex rel. Florida Bar Ass'n,* 373 U.S. 379, 385, 83 S.Ct. 1322, 1326, 10 L.Ed.2d 428 (1963) ("No State law can hinder or obstruct the free use of a license granted under an act of Congress") (quoting *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 54 U.S. (13 How.) 518, 566, 14 L.Ed. 249 (1851)). As a result, in cases where copyright holders have sought immunity from economic regulation, the Supreme Court has rested its decisions upon whether the activity which is the target of the challenged law is privileged under the Copyright Act. The Court has consistently concluded that, although copyrights are government sanctioned monopo-

**9.** For example, in reversing a lower court's use of "implied" preemption analysis when the federal act included express preemption language, the Supreme Court stated that:

"When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' *Malone v. White Motor Corp.,* 435 U.S. 497, 505 [98 S.Ct. 1185, 1190, 55 L.Ed.2d 443] (1978), 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation. *California Federal Savings & Loan Assn. v. Guerra,* 479 U.S. 272, 282 [107 S.Ct. 683, 690, 93 L.Ed.2d 613] (1987)."
*Cipollone,* — U.S. at —, 112 S.Ct. at 2618. *See also Crow,* 720 F.2d at 1225 (suggesting that conflict preemption under the act may not be proper: "we must determine in this case not whether Florida's prosecution of Crow conflicts with the provisions of the Copyright Act, but whether Crow's actions violated rights 'equivalent to any of the exclusive rights within the scope of copyright") (alteration in original); *Allied Artists,* 496 F.Supp. at 443–44 (conducting both analyses, but noting problem); 1 *Nimmer on Copyright* § 1.01[B] at 1–8 (1990) (suggesting that conflict preemption is unnecessary); *but see Associated Film Dist. Corp. v. Thornburgh,* 683 F.2d 808, 816 (3rd Cir.1982) ("conflict" preemption analysis appropriate in copyright case). A strong argument could be made that the above language in *Cipollone* applies only to "implied" preemption cases and not to "conflict" analysis, and, alternately, that, even if *Cipollone* does apply, § 301 is not a "reliable indicium" of Congress's intent with regard to state laws that burden the exercise of copyright privileges.

lies which may be exclusively licensed, they cannot be used by their owners to *restrain trade in violation of legitimate antitrust laws.*

Two cases illustrate the point that the result under both § 301 and "conflict" analyses turns on the same factor. The first, *United States v. Paramount Pictures,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), involved a price-fixing suit brought by the United States against several of the major motion picture studios. The federal government charged that the defendants, in the exhibition licenses they granted to theaters, dictated the minimum ticket prices the theaters could charge to the public. The defendants argued that, because the films in question were copyrighted and because the Copyright Act grants the owner exclusive rights to their films, the owner may license those rights at any terms it chooses. *Id.* at 143, 68 S.Ct. at 922. The Supreme Court disagreed and held that, although a copyright grant is itself a protected monopoly, the copyright holder may not use its copyright monopoly as leverage to restrain trade beyond the extent of its exclusive rights. The Court wrote:

" 'The rewards which flow to the patentee and his licensees from the suppression of competition through the regulation of an industry are not reasonably and normally adapted to secure pecuniary reward for the patentee's monopoly.' The same is true of the rewards of the copyright owners and their licensees in the present case. For here too the licenses are but a part of the general plan to suppress competition.... For a copyright may no more be used than a patent to deter competition between rivals in the exploitation of their licenses."

*Id.* at 144, 68 S.Ct. at 923. In *Cardinal Films v. Republic Pictures Corp.,* 148 F.Supp. 156 (S.D.N.Y.1957), the Copyright Act provided a successful defense against an antitrust suit. The defendant in that case was absolved from antitrust liability because its "anti-competitive" conduct amounted to no more than simple exploitation of its copyright monopoly. The defendant film production company had granted an exclusive license to distribute a number of its films to one of its distributors. Included in the agreement was a provision that the distributor must order directly from the producer all print copies required for the distribution of the films. The distributor later brought suit, claiming that the agreement amounted to a tie-in provision, violative of the Sherman and Clayton Acts. 15 U.S.C.A. §§ 1, 2, 14, 17. The court held that, because the producer had done no more than exploit its privileged monopoly and had not tried to expand its monopoly further than that allowed by the copyright laws, it could not be charged with antitrust liability. The court explained that:

"since the defendant's exercise of its copyright monopoly does not go beyond the legitimate exploitation of its exclusive privilege, there is no violation of the Sherman Act.... [T]here is no suppression of competition here beyond that permitted by the copyright law. The only competition precluded by the agreement and the only monopolization or restraint of trade involved is in connection with the processing of defendant's films, an activity over which defendant has been granted exclusive domain by copyright. There is no attempt to enlarge that domain by the leverage of the copyright ..."

*Id.* at 158–59. In short, these cases stand for the proposition that, although "[a]n agreement illegal because it suppresses competition is not any less so because the competitive article is copyrighted," *Interstate Circuit,* 306 U.S. at 230, 59 S.Ct. at 476, it is also true that "an agreement which goes no further than to preserve the legitimate monopoly of a copyright is not vitiated by the antitrust laws," *Cardinal Films,* 148 F.Supp. at 159.[10]

---

**10.** Similarly in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 16, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2 (1984), the Court wrote that:

"if the Government has granted the seller a patent or similar monopoly over a product, it

is fair to presume that the inability to buy the product elsewhere gives the seller market power.... Any effort to enlarge the scope of the patent monopoly by using the market power it confers to restrain competition in the

■ State laws which regulate anti-competitive behavior have been analyzed in the same manner. In *Watson v. Buck*, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941), the Court addressed a facial challenge to a Florida law which regulated the business practices of persons holding music copyrights. The statute barred price-fixing combinations of authors, composers, publishers, and owners of such rights. The plaintiffs, like those in the case at bar, argued that the statute deprived copyright owners of rights granted them by the federal copyright laws. The Court disagreed and held that a copyright does not encompass the right to combine in restraint of trade. The Court wrote:

"We find nothing in the copyright laws which purports to grant to copyright owners the privilege of combining in violation of otherwise valid state or federal laws. We have, in fact, determined to the contrary with relation to other copyright privileges.... We are pointed to nothing either in the language of the copyright laws or in the history of their enactment to indicate any congressional purpose to deprive the states, either in whole or in part, of their long-recognized power to regulate combinations in restraint of trade."

*Id.* at 404, 61 S.Ct. at 968. Conversely, local authorities, under the guise of trade regulation, cannot enact laws which go beyond the restriction of anti-competitive practices and target and extinguish one or more of the exclusive rights granted under § 106. *See Associated Film Distribution Corp. v. Thornburgh*, 683 F.2d 808, 816 (3rd Cir.1982). If this were not so, states could effectively extinguish copyright rights with their police power, a result which would surely frustrate the copyright scheme. The teaching of these cases is that state anti-competition laws which may have an incidental effect on the unfettered exercise of one of the exclusive rights embodied in the copyright grant are valid if their target is anti-competitive conduct beyond the scope of copyright protection. A copyright holder cannot be subject to a state-law created liability simply because it engaged in protected copyright activity.

■ In this case, then, it is apparent that the two preemption inquires, conflict preemption and § 301 express preemption, lead to the same essential question: If Ordinance 48–90 creates liability for a copyright holder and a licensee simply because the copyright holder granted an exclusive license to exhibit her work, then the ordinance cannot stand under the copyright laws. Exclusive licensing is one of the rights in the copyright monopoly and is in and of itself not anti-competitive behavior, and thus local governments may not ban the practice per se.[11] On the other hand, if liability is predicated only on proof of an additional element, such as anti-competitive purpose or effect, then Ordinance 48–90 will survive preemption, both statutory and conflict.

■ Therefore, the key and still unanswered question is exactly what Ordinance 48–90 regulates. The defendants assert throughout their briefs that the ordinance has a narrow scope and bans not all exclusive licenses but only those rare agreements which restrain trade. The plaintiffs, on the other hand, state that the ordinance amounts to a per se ban on exclusive license agreements. However, the parties have offered little guidance, by way of argument or authority, to assist the court in its task of statutory construction.

---

market for a second product will undermine competition on the merits in that second market. Thus, the sale or lease of a patented item on condition that the buyer make all his purchases of a separate tied product from the patentee is unlawful."
(Citations omitted).

**11.** In *Const. Aggregate Transport, Inc. v. Florida Rock Ind.*, 710 F.2d 752, 772–73 (1983), the Eleventh Circuit wrote that:

"It is well established that a merchant, whether he be a manufacturer, distributor, wholesaler, or retailer, may choose with whom he will do business and with whom he will not do business; such action generally does not violate the antitrust laws. Thus, the manufacturer can deal or not deal with customers 'for reasons sufficient to itself.' This sort of arrangement, referred to as 'exclusive dealing,' does not give rise to antitrust liability without proof of actual competitive injury."

The language and structure of the ordinance appears to the court to be modeled on federal antitrust laws. Sections 1 and 2 of the Sherman Act, respectively, make it illegal to contract or combine in "restraint of trade" or to "monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize" any part of interstate trade or commerce. 15 U.S.C.A. §§ 1, 2.[12] The Clayton Act, as amended by the Robinson–Patman Act, prohibits price discrimination where "the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition." 15 U.S.C.A. § 13(a).[13] The act further provides that, "Upon proof being made ... that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section." 15 U.S.C.A. § 13(b). The Clayton Act further prohibits leases, sales or contracts made on the condition that the lessee or purchaser shall not use or deal in the goods of a competitor of the lessor or seller "where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C.A. § 14.

■ Section 3 of Ordinance 48–90 borrows the "restraint of trade" and "monopolize" language of §§ 1 and 2 of the Sherman Act to ban unilateral activity which restrains trade or monopolizes in the area of cable television service. Section 4 of the ordinance appears to track the Clayton and Robinson–Patman Acts except that, rather than banning price discrimination or contracts conditioned on the buyer's refusal to deal with competitors of the seller, it bans discrimination or limitation in the lease, license, sale or exchange of program material where "the purpose or effect of such contract, combination, or discrimination is or may be to tend to create a monopoly or to injure, destroy, inhibit, prevent or lessen substantially competition." Section 7 of the ordinance is a burden shifting clause, presumably modeled on 15 U.S.C.A. § 13(b). It provides that proof of one of the proscribed acts creates a presumption that a defendant bore an impermissible purpose.

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* that nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered."
15 U.S.C.A. § 13(a).

**12.** Section one of the Sherman Antitrust Act declares that:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."
15 U.S.C.A. § 1. Section two reads:
"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."
15 U.S.C.A. § 2.

**13.** The subsection provides in relevant part as follows:

The federal antitrust laws have been interpreted by the courts for years, and volumes of case law have been developed fleshing out their compact language. The Sherman Act has been deemed to be concerned with actual restraints on trade, whatever form they may take, while the Clayton Act has been held to address specific arrangements, prohibiting those which tend either to lessen competition or create monopolies. *Twin City Sportserv., Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1275 (9th Cir.1975). Section 1 of the Sherman Act addresses concerted action. Certain agreements subject to § 1 have been held to be per se illegal, meaning that no demonstration of actual harm is required, while all other agreements are subject to a "rule of reason." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984).[14] "Exclusive dealing" agreements are subject to the later analysis under the Sherman Act and proof of competitive injury is required to show a restraint of trade or monopolization.[15] Section 2 of the act is concerned with independent action and requires a "dangerous probability" of monopolization. *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir.1989). Likewise, courts have held that the "substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition" language of the Clayton Act

simply means that the plaintiff must establish a "reasonable probability" of injury to competition. *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1417 (11th Cir.1990).

The court assumes that the city, by borrowing language and phrases from the Sherman, Clayton, and Robinson–Patman Acts, meant also to import the accumulated case law interpreting that language, and there is no reason to doubt the Alabama courts will avail themselves of this jurisprudence. *See Avery Freight Lines, Inc. v. Alabama Public Serv. Comm'n*, 267 Ala. 646, 104 So.2d 705, 709 (1958) ("In construing the terms and provisions of Alabama statutes derived from federal statutes, such terms and provisions will usually be considered as having the meaning given by the federal courts"); *Rice v. Alabama Surface Mining Com'n*, 555 So.2d 1079, 1081 (Ala.Civ.App.1989) ("federal case law construing federal statutes upon which Alabama statutes were patterned will be given great weight as persuasive authority in determining construction of a state statute").[16] That being so, a licensing arrangement between a cable programmer and a cable exhibitor whereby the exhibitor is granted the exclusive right to show the programmer's programming within a geographic area would not, without more, run afoul of Ordinance 48–90 § 3's prohibition on restraints of trade and monopolization. As noted above, exclusive agreements are

---

**14.** Examples of per se prohibited combinations are price fixing and market division agreements. *Copperweld Corp., supra.*

**15.** Justice O'Connor has written that:

"Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of the market by the exclusive deal.... When the sellers of services are numerous and mobile, and the number of buyers is large, exclusive-dealing arrangements of narrow scope pose no threat of adverse economic consequences. To the contrary, they may be substantially pro-competitive by ensuring stable markets and encouraging long-term, mutually advantageous business relationships."

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551, 1576, 80 L.Ed.2d 2 (1984) (O'Connor, J., with whom Burger, C.J., and Powell and Rehnquist, JJ., join, concurring

in judgement) (citation omitted). Similarly, the Eleventh Circuit has stated that:

"This sort of arrangement, referred to as 'exclusive dealing,' does not give rise to anti-trust liability without proof of actual competitive injury. Implicit in the freedom to deal exclusively with one merchant, of course, is the freedom to refuse to deal with a competitor of that merchant."

*Const. Aggregate Transport v. Florida Rock Ind.*, 710 F.2d 752, 773 (11th Cir.1983).

**16.** *See also Evans v. United States*, ―― U.S. ――, ―― n. 3, 112 S.Ct. 1881, 1885 n. 3, 119 L.Ed.2d 57 (1992) ("if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it") (quoting Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 537 (1947)); *see K–S Pharmacies, Inc. v. American Home Products Corp.*, 962 F.2d 728, 732 n. 2 (7th Cir.1992).

only proscribed if "unreasonable," and proof of competitive injury is required to show a restraint of trade or monopolization. In order to prevail on a claim under § 3, therefore, a party must prove an additional, meaningful element other than that the other party exercised engaged in conduct protected by the Copyright Act. Consequently, this court finds that § 3 of the ordinance is not preempted by the Copyright Act.

■ The combined operations of §§ 4 and 7 of Ordinance 48–90, on the other hand, present serious concerns and cannot be reconciled in their entirety with the Copyright Act. It is true that little difficulty is encountered construing the "purpose or effect" clause of § 4 because the phraseology—"is or may be to tend to create a monopoly or to injure, destroy, inhibit prevent or lessen substantially competition"—has been interpreted by Clayton and Robinson–Patman Act case law to mean conduct which poses a "reasonable probability" of injury to competition. *See Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1417 (11th Cir.1990). However, the court is troubled by another aspect of these sections which represents a significant departure from the Clayton and Robinson–Patman Acts. Under 15 U.S.C.A. § 13(a), the proscribed conduct is "price discrimination," meaning the charging of different prices to different customers for the same goods, *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F.Supp. 1527, 1546 (N.D.Ill.1991), and the agreements which are prohibited under 15 U.S.C.A. § 14 are those predicated on a promise exacted from the buyer, not the seller, to refuse to deal with the competitors of the other, *Dillon Materials Handling, Inc. v. Albion Industries*, 567 F.2d 1299, 1306 (5th Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 111 (1978). In contrast, § 4 of Ordinance 48–90 proscribes conduct that is both privileged under the Copyright Act and not violative of the Clayton and Robinson–Patman Acts. Standing alone,

this causes concern but does not present an insurmountable problem because § 4, as construed by the court, does not allow a party to simply rely on the occurrence of proscribed conduct to establish a prima facie case. The plaintiff must also establish a "purpose or effect"—that is, a "reasonable possibility"—of competitive harm, as under the Clayton and Robinson–Patman Acts. *See Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983).

However, § 4 of the ordinance does not stand alone but is supplemented by § 7. This burden shifting clause relieves a plaintiff from demonstrating a "purpose or effect," and thus a "reasonable possibility," of competitive harm. Upon the establishment of a proscribed act—in this case, the existence of an exclusive license—the plaintiff has made out a prima facie case: § 7 at that point shifts the burden to the defendant to prove a justifiable purpose. As a result, § 7 allows the plaintiff to bypass the "purpose or effect" element of § 4, and a defendant who fails to meet the affirmative burden of establishing a permissible purpose will be held liable under the ordinance without the plaintiff ever having demonstrated an "extra element" other than that the defendant legitimately exploited its copyright monopoly.[17]

This combination of § 4's designation of exclusive licensing as proscribed conduct with § 7's shifting of the burdens of proof places too high a burden on the copyright privilege. A party who holds a copyright for cable programming and who does no more than grant another an exclusive distribution or exhibition license is thus in automatic jeopardy of liability as a result of these sections, as is the licensee. The fact that these parties may ultimately prevail after a hard fought defense is little consolation.

---

**17.** In this respect, § 7 differs substantially from 15 U.S.C.A. § 13(b). Section § 13(b) does not have the effect of shifting the burden of an essential element of the plaintiff's case upon the defendant. It serves only to make the defenses

of cost justification and "meeting competition" affirmative defenses to a claim of price discrimination. *Texaco, Inc. v. Hasbrouck, Wash.*, 496 U.S. 543, 556, 110 S.Ct. 2535, 2542, 110 L.Ed.2d 492 (1990).

■ The court believes that the least disruptive solution is to strike down § 7 to the extent it raises a presumption that exclusive licensing contracts are illegal, while allowing § 4 to stand, rather than voiding both provisions. Section 4, if it is carefully applied with reference to the federal antitrust laws it emulates and with due regard to the values of the copyright law, does not in and of itself necessarily conflict with the Copyright Act. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977) ("[preemption] inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written"). Section 7 to the extent it raises a presumption that exclusive licensing contracts are illegal is, however, not amenable to any saving construction. Although state laws should be construed to avoid conflict with the federal constitution and laws, the court cannot attribute to the city a law it should have, but has not, written to avoid a constitutional problem. *K–S Pharmacies, Inc. v. American Home Products · Corp.*, 962 F.2d 728, 730 (7th Cir.1992). However, because, pursuant to § 8, the ordinance is fully severable, the partial invalidation of § 7 has no bearing on the validity of § 4.

The plaintiffs' implied preemption argument can be disposed of quickly. Although some doubt exists as to whether conflict preemption analysis is proper when the federal statute at issue contains an express preemption clause, implied preemption analysis would be illogical under such circumstances. *See Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617; *Wisconsin Public Intervenor v. Mortier,* —— U.S. ——, ——, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991); *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375.

### B. Lanham Act Preemption

■ The plaintiffs also argue that Ordinance 48–90 is preempted by the Lanham Act, 15 U.S.C.A. § 1051, *et seq.*, which regulates federal trademark law. The logic of their contentions proceeds along the same lines as their copyright arguments. According to the plaintiffs, ESPN not only copyrights its programming, it also identifies and distinguishes its programming by using a federally registered trademark name and logotype. By forcing ESPN to license its exclusive programming, which presumably also carries ESPN's trademarks, Ordinance 48–90 violates the Lanham Act's purported guarantee that a trademark owner may grant the use of its trademark on the terms and conditions of its choosing. Unlike their copyright claims, however, the plaintiffs' claims of preemption under the Lanham Act must be rejected in their entirety.

■ The Lanham Act's preemptive scope is not the same as that of the Copyright Act. Although § 301 of the Copyright Act expressly preempts parallel state-law copyright protections, the Lanham Act's preemption clause is much narrower and does not preempt state trademark protections.[18] *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 n. 3 (1st Cir.1980); *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 857–58 (3rd Cir.1975). Instead, the · Lanham Act sets a protective floor only and does not interfere with state laws which provide additional trademark protection. The act preempts only those state laws which directly conflict with its provisions or purposes by permitting an erosion of trademark rights. *Mariniello,* 511 F.2d at 858.

Trademark rights are not analogous to copyright or patent protection; state laws that conflict with the Copyright Act will not necessarily implicate the Lanham Act. Unlike copyright grants, trademark law does not give the right holder any exclusive rights in a product. Instead, the Lanham Act grants an exclusive right to a mark used to identify products, their origin, or their sponsor, *Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d Cir.1979); 15 U.S.C.A. § 1127. The act allows merchants to identify goods as their own with a distinctive mark or name and prevents others from imitating

---

18. 15 U.S.C.A. § 1127 states that "The intent of this chapter is to ... protect registered marks used in [interstate] commerce from interference by State ... legislation."

the protected mark on their own goods in such a manner that purchasers are deceived into believing that the products originated with or were approved by the mark's owner. The purpose underlying the Lanham Act is, therefore, two-fold: "One is to protect the public so it may be confident that ... it will get the product which it asks for and wants to get," and the other is that, "where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats." *Mariniello*, 511 F.2d at 858 (quoting the Senate report accompanying the Lanham Act, S.Rep. No. 1333, 79th Cong., 2d Sess., *reprinted in* 1946 U.S.Code Cong.Serv. 1274) (alterations in original); *See also Keebler*, 624 F.2d at 372 n. 3; *Dallas Cowboys*, 604 F.2d at 204–05.

■ A mark holder has a cause of action only if a defendant uses its mark without consent in a manner likely to cause customer confusion, that is, if the infringer places the protected mark on its own products so that the public will believe that the products are produced by the trademark owner. 15 U.S.C.A. § 1114; *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 137 (3rd Cir.1981). Therefore, a state law is preempted only if it would "permit confusing or deceptive trademarks to operate, infringing on the guarantee of exclusive use to federal trademark holders."

*Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir.1980).

Applying these principles to the circumstances of this case, it is apparent that ESPN's trademark rights would not be contravened by the enforcement of even the most expansive interpretation of Ordinance 48–90. The plaintiffs offer no authority for their proposition that a state law which acts to force a party to license its *product* against its will conflicts with trademark rights. The case law indicates that state laws are not preempted even if they operate to compel a mark owner to license its mark, so long as the mark continues to be associated with the owner's product or endorsement. The *Mariniello* case is instructive on this point. In *Mariniello*, the Shell Oil Company argued that New Jersey's "good cause" restrictions on franchise terminations were preempted by the Lanham Act. The company's theory was that the state law effectively granted to franchisees the right to continued use of Shell trademarks in those circumstances when Shell wished to terminate a franchise agreement "at will." The court rejected this argument, holding that no deception of the public would result in the use of Shell's trademarks by what would be, under state law, a true Shell franchisee. 511 F.2d at 857–859.[19]

Even if Ordinance 48–90 has the effect that the plaintiffs fear and coerces them to license their programming to Montgomery Cablevision, they have not hinted at how

19. *Kiwanis Intern. v. Ridgewood Kiwanis Club*, 627 F.Supp. 1381 (D.N.J.), *rev'd on other grounds*, 806 F.2d 468 (3rd Cir.1986), involved an analogous scenario. The case concerned an unusual challenge to a New Jersey law which prohibited discrimination in places of public accommodation. The national Kiwanis organization filed suit against its New Jersey chapter when the local chapter, in seeking to comply with the New Jersey law, admitted women in violation of the Kiwanis national constitution. The national organization sought to revoke the local's license to use the organization's trademarks on the grounds that the local had forfeited its license by breaching the Kiwanis charter. The national organization argued that the Lanham Act would not permit New Jersey law to be applied in such a way as to force the organization to license its trademark against its wishes. The district court disagreed. It held that in

light of New Jersey's anti-discrimination laws, the plaintiff would not be permitted to withdraw its trademark, and further held that the Lanham Act did not preempt such an application of state law. The court reasoned that the local chapter would be, under state law, a genuine Kiwanis chapter, and thus that the Lanham Act would not be offended by the local's use of the Kiwanis mark, albeit without the national's "consent." 627 F.Supp. at 1391–92. The Third Circuit Court of Appeals reversed on the ground that the local chapter was not a "place of public accommodation" as defined by the New Jersey statute and thus was not subject to the anti-discrimination law. 806 F.2d at 477. However, relying on *Mariniello*, the appellate court noted that it agreed with the district court's preemption analysis under the Lanham Act. 806 F.2d at 472 n. 8.

customer confusion will result from their products being carried to viewers by other cable operators. Whether viewed on Storer Cable or Montgomery Cablevision, the programming in question, like the gasoline sold by the franchisee in *Mariniello*, would be genuine programming, as their marks purported them to be. There is no suggestion that the plaintiffs' trademarks would be used with "imitation" programming or that the ordinance would sanction the use by other programmers of marks misleadingly similar to those owned by the plaintiffs. No customers would be fooled by a mark into thinking they were viewing the plaintiffs' program when in fact they were viewing the programming of a competitor. Therefore, the court concludes that applying Ordinance 48–90 to the plaintiffs would not interfere with the provisions or purposes of the Lanham Act.

### C. Cable Act Preemption

The plaintiffs contend that both Ordinances 9–90 and 48–90 are preempted by the Cable Communications Policy Act of 1984, 47 U.S.C.A. §§ 521, *et seq.* The court concludes that the plaintiffs have established that the Cable Act preempts a portion of Ordinance 9–90, but have failed to demonstrate that the act preempts Ordinance 48–90.

#### 1. Ordinance 9–90

In the Cable Act, Congress established a national policy concerning cable communications and, in so doing, defined the relative domains of federal, state and local regulation of cable systems. 47 U.S.C.A. § 521. In some areas the act furthers the regulatory authority of states and localities at the expense of what had been the exclusive domain of the Federal Communications Commission (FCC) prior to its passage, in others the act preempts local regulatory power, and in some instances the act divests both the states and the FCC of regulatory authority. *See Cable Television Ass'n v. Finneran,* 954 F.2d 91, 97 (2nd Cir.1992).

With respect to Ordinance 9–90, both parties agree that, if the ordinance is preempted by the Cable Act, its preemption is governed by 47 U.S.C.A. § 543, entitled "Regulation of Rates." Section 543 expressly preempts federal, state, and local regulation of the rates charged by cable companies. Subsection (a) provides that:

"Any Federal Agency or State may not regulate the rates for the provision of cable service except to the extent provided under this section. Any franchising authority may regulate the rates for the provision of cable service, or any other communications service provided over a cable system to cable subscribers, but only to the extent provided under this section."

47 U.S.C.A. § 543(a). Section 543 provides for a few exceptions to the general preclusion of rate regulation. For example, where the FCC has determined that effective competition does not exist, it may authorize franchising authorities to impose rate regulations on the provision of basic service. § 543(b). Additionally, the FCC, states, and franchising authorities are free to prohibit "discrimination among customers of basic cable service." § 543(f)(1). The defendants do not contend that Ordinance 9–90 was enacted pursuant to an FCC determination that the Montgomery cable market lacked effective competition. Instead, the defendants justify the ordinance on two grounds.

■ First, they contend that Ordinance 9–90 does not "regulate the rates" for the provision of cable services and is therefore not governed by § 543 at all. Their argument is that, because the ordinance does not establish a specific pricing schedule or "freeze" rates at a set level but only prohibits "anti-competitive" rate setting, it is not a regulation of cable rates but rather a general exercise of the city's police power, which is not preempted by the act. *See* 47 U.S.C.A. § 556(a) (act does not preempt local police powers when exercised "to the extent consistent with the express provisions of this subchapter"); 47 U.S.C.A. § 552(a)(1) (franchise agreement may include customer service requirements).

Although some ordinances may inhabit the borderline between a rate regulation and a permissible regulation of the franchisee's business relationship with its custom-

ers, Ordinance 9–90 does not.[20] The words "rate" and "regulation" have well-accepted meanings in ordinary usage. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). The defendants have not pointed to any language in or policy of the Cable Act which would indicate that the words "regulation" or "rates" were used by Congress in other than their plain meaning. The commonsense meaning of "regulate" is "to govern or direct according to rule or to bring under control of constituted authority, to limit and prohibit, to arrange in proper order, and to control that which already exists." Black's Law Dictionary at 1156 (5th ed. 1979). *See also Nashoba Com. Ltd. Part. No. 7 v. Town of Danvers,* 703 F.Supp. 161, 165 (D.Mass.1988), *rev'd on other grounds,* 893 F.2d 435 (1st Cir.1990). A "rate" in this context is the amount of money charged to subscribers to receive cable service. *See Comcast Cablevision v. City of Sterling Heights,* 178 Mich.App. 117, 443 N.W.2d 440, 442 (1989). The contested portion of the ordinance is entitled "Rates Charged to Subscribers." Its language does no more or less than prohibit certain rates which afford undue preference among customers and rates which are so low as to diminish competition. Clearly, Ordinance 9–90 is a rate regulation.

Alternatively, the defendants argue that the ordinance, insofar as it regulates basic cable service, falls within the "anti-discrimination" exception of § 543(f). Although neither the language nor the legislative history of § 543(f) provide guidance as to what is meant by that section's allowance of local regulations which prohibit "discrimination" among customers of "basic cable service," the court readily agrees that the following sentence falls within this exception to the extent it applies to basic cable service:

"No rate established shall afford any undue preference or advantage among subscribers, but separate rates may be established for separate classes of subscribers and rates may reflect the increased cost of providing service to isolated or sparsely populated areas."

The defendants read § 543(f) as being akin to an anti-redlining provision, a prohibition on disparate pricing based on the income of residents of particular neighborhoods or other non-neutral, unreasonable factors. Section 543(f) does appear to be a complement to § 541(a)(3), which requires franchising authorities to ensure that franchisees do not deny cable service to neighborhoods based on the income of their residents. *American Civil Liberties Union v. FCC,* 823 F.2d 1554, 1579 (D.C.Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). Section 543(f) also appears to be a shorthand expression of 47 U.S.C.A. § 202(a), which prohibits common carriers from "mak[ing] any unjust or unreasonable discrimination" in charges or services, or "mak[ing] or giv[ing] any undue or unreasonable preference or advantage to any particular person, class of persons, or locality."[21] Courts have interpreted § 202(a) as prohibiting carriers from charging different customers different prices for the same services when the price variations lack a neutral, rational justification. *National Ass'n of Reg. Util. Com'rs v. FCC,* 737 F.2d 1095, 1133 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 2224,

---

**20.** For example, under §§ 552 and 556, franchisers may prohibit disconnect fees, limit late charges, and order rebates for service outages, because such fees and rebates are not "rates for the provision of cable service". *Cable Television Ass'n v. Finneran,* 954 F.2d at 97; H.R.Rep. No. 934, 98th Cong., 2d Sess., 44, 79, *reprinted in* 1984 U.S.Code Cong.Ad.News 4655, 4716; N. Lehto, *Cable TV Rates and Service Charges: Upholding Municipal Regulatory Authority Under the U.S. Cable Act,* 1989 Det.C.L.Rev. 1401.

**21.** 47 U.S.C.A. § 202(a) reads in full as follows: "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."

84 L.Ed.2d 364 (1985).[22] The court has not been presented with any reason why § 543(f)'s use of the phrase "discrimination among customers of basic cable service" should not be given the same scope. An examination of Ordinance 9–90's prohibition on cable rates that afford "any undue preference or advantage among customers" reveals that it is almost identical to the prohibitory language of § 202(a). Its terms do no more than apply § 202(a)'s language to cable franchisers and, so far as they are applied in this manner, these terms fit neatly within the safe harbor of § 543(f).[23]

■ On the other hand, the following provision barring anti-competitive rate cutting is not protected by § 543(f):

"In no event shall rates be established so low for any class of subscriber or for any geographic location as to prevent, discourage, restrict, or diminish competition in the furnishing of cable services."

The city admits that this language "extends beyond rate discrimination among customers or geographic areas within the franchise area to prohibit predatory pricing that is city-wide." In other words, this part of the ordinance has nothing to do with discrimination but with predatory pricing, an entirely different practice. Predatory pricing, as recognized by the antitrust laws, entails the deliberate sacrifice of current revenues through lower prices for the purpose of driving rivals out of the market. *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F.Supp. 1527, 1537–38 (N.D.Ill.1991). If Storer Cable were to lower its rates uniformly within the city of Montgomery in such a way that every customer were effected equally or to lower its rates in one part of the city not for discriminatory purposes but in order to drive Montgomery

Cablevision out of the market, the company would be in jeopardy of running afoul of this provision even though it would not have been engaging in price discrimination. As a result, the above language from Ordinance 9–90 does not fall within the exception to § 543(a)'s ban on rate regulation and is preempted.

### 2. Ordinance 48–90

■ With respect to Ordinance 48–90, the parties agree that the ordinance's fate is determined by 47 U.S.C.A. § 544, entitled "Regulation of services, facilities, and equipment." The section contains two provisions which address preemption, § 544(a) and (f). Subsection (a) provides that:

"Any franchising authority may not regulate the services, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter."

(emphasis added). Subsection (f) states as follows:

"Any federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services except as expressly provided in this subchapter."

The distinction between these two subsections could have been made clearer in the statute. However, their text indicates that a local regulation falling under subsection (f), one that imposes "requirements regarding the provision or content of cable services," will stand only if the franchising authority can point to a provision of the Cable Act which expressly permits it. In contrast, a local regulation which is governed by subsection (a) but not by subsection (f), one that "regulate[s] the services, facilities, and equipment provided by a cable opera-

---

**22.** Similarly, under the antitrust laws, prohibited price discrimination means the charging of different prices to different customers for the same goods without cost justification. *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1417–18 (11th Cir.1990); *see also Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 556–58, 110 S.Ct. 2535, 2542–44, 110 L.Ed.2d 492 (1990) (price discrimination is "merely a price difference" and is prohibited if not justified by cost or competitive factors).

**23.** The defendants implore this court to extend § 543(f)'s coverage to local "anti-discrimination" ordinances as they apply to all cable services, not just basic cable service. Apparently, they fear that the plaintiffs will employ discriminatory practices in the provision of non-basic cable services. This the court cannot do, as the act's language is unmistakably clear on this point.

tor," will be struck down if a challenger can show an inconsistency between the local rule and federal regulation. *See generally United Video, Inc. v. FCC*, 890 F.2d 1173 (D.C.Cir.1989).

█ The defendants have located no express allowance encompassing Ordinance 48–90 and thus admit that if the ordinance falls within subsection (f) it is preempted. Therefore the force of their argument is that subsection does not apply here. In addressing the application of subsection (a), under which the burden is upon the plaintiffs, they do not suggest that Ordinance 48–90 is inconsistent with a provision of the act itself. Instead, their theory is that certain FCC regulations passed pursuant to the Cable Act conflict with and thus preempt the ordinance.

█ As a first step then, the court must determine whether the ordinance is governed by subsection (f). If it is, then it is preempted. Although the language of subsection (f) is susceptible to a broad reading, the only appellate decision interpreting this provision has given it quite a narrow scope. In *United Video*, the Court of Appeals of the District of Columbia Circuit determined that the plain language of § 544(f) shed little light on the provision's proper application. 890 F.2d at 1187–88. The court then examined the context in which Congress adopted the language, observing that:

"It had been the practice of local franchising authorities, in granting cable franchises, to specify in great detail the type of facilities that the operator must construct, and also to specify 'the services that the operator must provide (e.g. Cable News Network, HBO, The Health Channel).' H.R.Rep. No. 934, 98th Cong., 2d Sess. 26, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4663. Congress determined that local governments should have the power to require particular cable facilities, but 'the Committee does not believe it is appropriate for government officials to dictate the specific programming to be provided over a cable system.' *Id.*"

*Id.* at 1188. The court concluded that:

"the examples given in the House report suggest that the key is whether a regulation is content-based or content-neutral. Section 544(f), one must note does not simply forbid 'requirements'; it forbids 'requirements regarding the *provision* or *content* of cable services.' The House report suggests that Congress thought a cable company's owners, not the government officials, should decide what sorts of programming the company would provide. But it does not suggest a concern with regulations of cable that are not based on the content of cable programming, and do not require that particular programs or types of programs to be provided."

*Id.* at 1189. (emphasis in original). This court is persuaded by the District of Columbia's analysis of the legislative history and by the court's conclusion that § 544(f)'s concern is with "content-based rules" which require or forbid cable providers from carrying particular programming. *See id.*

The reasoning of the *United Video* case also compels the conclusion that Ordinance 48–90 is not controlled by subsection (f). The circumstances of that case are worth explaining in detail here. Under the court's consideration was a challenge to the FCC's syndicated exclusivity ("syndex") rules. A syndicated television program is one marketed from its supplier to local television stations without the involvement of one of the national networks. *Id.* at 1176. The suppliers of syndicated programs often granted exclusive licenses to local television stations assuring that the stations would be the exclusive presenters of these programs within their broadcast area. However, cable operators have the ability to receive broadcast signals over the air from one area and to retransmit the signal by cable to subscribers in a different area. *Id.* Because this retransmission is not a "broadcast" under the Communications Act, 47 U.S.C.A. § 153(*o*), and did not implicate the copyright laws prior to their 1976 revision, local television broadcasters who had purchased the exclusive rights to programs were left without a remedy against cable operators who imported them

into their service area. *Id.* at 1177. In response, the FCC adopted an industry consensus agreement in 1972 which included syndex rules. *Cable Television Report & Order,* 36 F.C.C.2d 143, 284–86 (1972). These regulations allowed the local television broadcasters to enforce their exclusive licenses against the cable stations. *United Video,* 890 F.2d at 1176–78. In 1980, the commission eliminated the syndex rules in light of changes in the copyright laws. *CATV Syndicated Program Exclusivity Rules,* 79 F.C.C.2d 663 (1980). Finally, in 1988, the commission re-evaluated its understanding of the effects of exclusivity upon programming diversity and reinstated the syndex rules. *In the Matter of Amendment of Parts 73 and 76 of the Commission's Rules Relating to Program Exclusivity in the Cable and Broadcast Industries,* 3 F.C.C.Rcd 5299 (1988), *on reh'g,* 4 F.C.C.Rcd 2711 (1989).

In *United Video,* the cable companies challenged the 1988 rules on several grounds, one contention being that, because the rules would forbid cable companies from carrying certain programming, they were "requirements regarding the provision or content of cable services" and therefore preempted by § 544(f). The court disagreed and held that, even though the syndex rules would have an effect on the content of cable programming, the rules themselves were content-neutral. The court wrote:

"The basis on which syndex forbids carriage of certain programs is not their content, but ownership of the right to present them. Syndex itself does not require carriage of any particular program or type of program, nor does it prevent a cable company from acquiring the right to present, and presenting, any program."

*Id.* at 1189. In applying this analysis to the present case, this court concludes that

Ordinance 48–90 is also content-neutral. As the Supreme Court has declared,

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."

*Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (citations omitted). *See also Simon & Schuster, Inc. v. New York State Crime Victims Bd.,* —— U.S. ——, ——, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991). The ordinance does not require or forbid anyone, Storer Cable or Montgomery Cablevision, to carry certain programming. To the extent that it might require the plaintiffs to license programming, it would do so on basis of the market effects of the targeted licenses, not on the content of programming. The ordinance would not, even under these conditions, interfere with the editorial decisions of the plaintiffs by telling them what programming they can or cannot provide to the public. The plaintiffs have never suggested, here or within the context of their first amendment challenge to this ordinance, that the purpose or effect of Ordinance 48–90 is to suppress a particular message or viewpoint. For these reasons, Ordinance 48–90 is not preempted by subsection (f) of § 544.[24]

■ As stated above, relying on subsection (a) of § 544, the plaintiffs contend that Ordinance 48–90 is both inconsistent with and displaced by FCC regulations which occupy the field of exclusive cable programming. According to the plaintiffs, the

24. As a final argument on this point, the plaintiffs contend that *United Video* applies to FCC regulations only, and local ordinances should be analyzed differently. This argument is meritless. Subsection (f) applies, by its own terms, equally to "Any Federal agency, State, or franchising authority." The relevant issue before

the court in *United Video* was whether the challenged regulation was a "requirement regarding the provision or content of cable services." If the FCC rule was not such a "requirement," it is difficult to envision why a similar local regulation would be.

"exact subject" regulated by Ordinance 48–90 has also been the subject of "three major FCC decisions." This contention is disingenuous at best. The three FCC rulings to which the plaintiffs refer are the series of syndicated exclusivity rules discussed above, the most recent of which was the subject matter of the *United Video* case.[25] As discussed above and as discussed in much greater detail by the *United Video* court, the syndex rules were designed to protect *television* broadcasters from gaps in the copyright laws and the Communications Act which allowed cable operators to undercut their exclusive programming rights. The FCC, reacting to particular changes in both the regulatory and market landscape, alternately imposed syndex rules in 1972, lifted them in 1980, and finally reimposed them in 1988 after painstaking analysis. Between 1980 and 1988 the commission engaged in a virtual about face in its evaluation of exclusivity's effects on competition and program diversity. *See United Video*, 890 F.2d at 1176–82. Although the syndex rules encompass policy choices which arguably bear some relation to the practices at issue in this case, they are a highly detailed and specific response to a very different problem. The syndex rules themselves do not address exclusive licensing agreements among cable service providers for cable programming, and the plaintiffs have offered no authority which suggests that the rules should be expanded by courts to address circumstances beyond their expressed scope. Ordinance 48–90 is not in direct conflict with the FCC's syndex rules.

 The plaintiffs also argue that Ordinance 48–90 undermines the "policies" embodied in the syndex rules and should be preempted on those grounds. Admittedly, in the report accompanying the syndex rules, the commission noted with favor that exclusive arrangements in video programming had been employed as an effective means of competition. For example, the commission states: "in our view, reasonable exclusivity in the distribution of programming is an appropriate competitive tool for any distributor of video programming, including cable." *In the Matter of Amendment of Parts 73 and 76 of the Commission's Rules Relating to Program Exclusivity in the Cable and Broadcast Industries*, 3 F.C.C.Rcd 5299, 5336 n. 122 (1988). *See also id.* at 5309 ("all commenters agree that the ability to enter into exclusive contracts is a widely used competitive tool that is important to program suppliers, cable operators, and broadcasters.") However, in order for an FCC determination to have preemptive force, the commission must have intended its pronouncement to preempt state law. *Fidelity Federal Sav. & Loan Ass'n v. de La Cuesta*, 458 U.S. 141, 154, 102 S.Ct. 3014, 3023, 73 L.Ed.2d 664 (1982); *Cable Television Ass'n v. Finneran*, 954 F.2d 91, 100 (2nd Cir.1992). As discussed above, in evaluating the re-instatement of its syndex rules, the commission was proposing, for the third time, a solution to a well defined problem. The commission's commentary to syndex may provide some insight into how the commission, in 1988, might have chosen to regulate arguably analogous practices such as those governed by Ordinance 48–90. There is no indication, though, that in justifying its syndex rules, the commission intended to preempt a whole area of state law not yet under consideration. Therefore, this court declines to hold that the FCC's syndex commentary has the effect of preempting Ordinance 48–90.

To summarize, with regard to Ordinance 9–90, the court holds that the Cable Act preempts the following sentence except to the extent that it applies to basic cable service:

"No rate established shall afford any undue preference or advantage among subscribers, but separate rates may be established for separate classes of subscribers and rates may reflect the in-

---

**25.** *Cable Television Report & Order*, 36 F.C.C.2d 143 (1972); *CATV Syndicated Program Exclusivity Rules*, 79 F.C.C.2d 663 (1980); *In the Matter of Amendment of Parts 73 and 76 of the Commission's Rules Relating to Program Exclusivity in the Cable and Broadcast Industries*, 3 F.C.C.Rcd 5299 (1988), *on reh'g*, 4 F.C.C.Rcd 2711 (1989) (codified at 47 C.F.R. §§ 73.658, 76.92 to 76.97, and 76.163).

creased cost of providing service to isolated or sparsely populated areas."

The court further holds that the Cable Act preempts the following sentence in its entirety:

"In no event shall rates be established so low for any class of subscriber or for any geographic location as to prevent, discourage, restrict, or diminish competition in the furnishing of cable services."

Finally, the court holds that the Cable Act does not preempt Ordinance 48–90 in whole or in part.

### D. Sherman Act Preemption

■■■ Turner Network argues that Ordinance 48–90 is preempted by the Sherman Act, 15 U.S.C.A. §§ 1, 2, because the ordinance prohibits *all* exclusive dealing arrangements between cable programmers and cable operators while the Sherman Act prohibits only those which have an unreasonable anti-competitive effect. The company further argues that the exclusive licensing agreements at issue in this case are actually pro-competitive and thus further the purposes and objectives of the Sherman Act. Because they are banned under Ordinance 48–90, Turner Network concludes, the ordinance has an anti-, rather than pro-, competitive effect and thus "stands as an obstacle" to the accomplishments of the act's purpose.

■■■■ Both of Turner Network's arguments must be rejected. First, state laws which proscribe conduct permitted by the Sherman Act are not preempted. A state or local enactment is preempted in the somewhat converse scenario: "only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Fisher v. Berkeley*, 475 U.S. 260, 264, 106 S.Ct. 1045, 1048, 89 L.Ed.2d 206 (1986). While not prohibiting them, the Sherman Act certainly does not create a "right" to enter into permissible exclusive dealing agreements. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 131–133, 98 S.Ct. 2207, 2216–17, 57

L.Ed.2d 91 (1978). As to Turner Network's second argument, the Supreme Court in *Exxon* squarely rejected just such a claim and held that state laws do not "conflict" with federal antitrust law simply because they may have an anti-competitive effect. The Court explained:

"[Plaintiffs] argue that the Maryland statute 'undermines' the competitive balance that Congress struck between the Robinson–Patman and Sherman Acts. This is merely another way of stating that the Maryland statute will have an anticompetitive effect. In this sense, there is a conflict between the statute and the central policy of the Sherman Act—our 'charter of economic liberty' ... Nevertheless, this sort of conflict cannot itself constitute a sufficient reason for invalidating the Maryland statute. For if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed."

*Id.* at 133, 98 S.Ct. at 2217–18 (citations omitted). *See also Fisher*, 475 U.S. at 264–65, 106 S.Ct. at 1048

## III. STATE LAW CLAIMS

### A. Ultra-vires

■■■ The plaintiffs offer several contentions that the Ordinances 9–90 and 48–90 contravene Alabama constitutional and statutory law. First, Turner Network argues that Ordinance 48–90 is beyond the City of Montgomery's power to enact. According to the defendants, Ordinance 48–90 is simply an exercise of the city's general police power. The residual police power of Alabama's municipalities is governed by Alabama Code 1975 § 11–45–1:

"Municipal corporations may from time to time adopt ordinances and resolutions not inconsistent with the law of the state ... to provide for the safety, preserve the health, promote the propriety and improve the morals, order, comfort and convenience of the inhabitants of the municipality, and may enforce obedience to such ordinances."

The city's charter allows the city to exercise its powers to the fullest extent allowable under Alabama law. *See* Alabama Acts No. 618 (1973) ("The City shall have all the powers granted to municipal corporations and to cities by the Constitution and laws of this state together with all the implied powers necessary to carry into execution all the powers granted.") The Alabama Supreme Court has had occasion to determine the limits of municipal authority granted under § 11–45–1. In the words of the court, "The validity of a police power regulation ... primarily depends on whether, under all existing circumstances, the regulation is reasonable, and whether it is really designed to accomplish a purpose properly falling within the scope of the police power." *City of Russellville v. Vulcan Materials Co.*, 382 So.2d 525, 527 (Ala. 1980). "Cities may not, under the guise of the police power," the court continued, "impose restrictions that are unnecessary and unreasonable upon use of private property or the pursuit of useful activities." *Id.*

Turner Network does not argue that Ordinance 48–90 is inconsistent with a particular state law. Therefore, the sole inquiry is whether the ordinance is "reasonable" and relates to purposes properly falling within the city's police power. The burden on a party attacking a municipal ordinance on this ground is extremely heavy and, under Alabama law, this court's scope of inquiry is quite limited. First, municipal ordinances are presumed to be valid, reasonable, and within the scope of the municipal police power and cannot be struck down unless they are "clearly arbitrary and unreasonable." *Hall v. City of Tuscaloosa*, 421 So.2d 1244, 1247 (Ala. 1982). Second, in evaluating the ordinance under this line of inquiry, this court is not permitted to look beyond the face of the enactment in search of impermissible legislative motives or intent. Instead, invalidity must be "apparent upon the face of the act." *Id.* at 1247.

Ordinance 48–90's declared purpose is to "promote and insure free and open competition among corporations or persons franchised under Ordinance 50–76 to operate cable television systems and to provide cable television service to the citizens of Montgomery." And, as discussed above, the challenged portions of the ordinance on their face prohibit anti-competitive activities relating to the provision of cable programming and services and specifically bar certain types of licensing agreements for cable programming which tend to have an anti-competitive purpose or effect.

Turner Network first challenges the ordinance facially by arguing that any public interest in free and open competition in the cable industry does not justify what the company characterizes as pervasive regulation of their business. The company does not appear to be claiming that the facial purpose of the ordinance is impermissible under Alabama law. Moreover, even if the company had made such a contention, this court would decline to so find absent unmistakable state-law authority to that effect, and Turner Network has offered none. Turner Network's contention, therefore, can be fairly characterized as challenging not the facial ends of the ordinance, but its means; the company contends that its means exceed what is "reasonable" to achieve the law's stated purpose. It may be so that the provisions of Ordinance 48–90 restrict the plaintiffs' behavior more than is necessary to achieve free competition in the cable industry in Montgomery. It may also be true, as the plaintiffs contend, that the ordinance will in fact have the opposite effect as intended and limit competition in Montgomery by driving the plaintiffs out of the market. The court, however, will not subject the ordinance to this type of scrutiny. If an ordinance's relation to the public's general welfare or convenience is "fairly debatable, a court will not substitute its judgement for that of the municipal government body acting in a legislative capacity." *City of Russellville*, 382 So.2d at 527 (quoting *City of Birmingham v. Norris*, 374 So.2d 854, 856 (Ala.1979)). Therefore, it is irrelevant in the context of resolving this "ultra-vires" claim, whether Ordinance 48–90 will actually serve its intended purpose. What is important is whether the enactment is "designed" to achieve its purposes and is

not clearly an arbitrary and unreasonable law.

It is certainly "debatable" that this ordinance, closely modeled on federal antitrust law, is structured to prohibit anti-competitive behavior without unduly burdening the cable industry in Montgomery, and Turner Network has not shown that the City of Montgomery could not have reasonably believed that the exclusive licensing agreements at issue in this case are in some part responsible for diminishing effective competition in the Montgomery cable market.

■■■ Turner Network is correct that municipalities cannot assert a broad public interest in the existence of a business and use such an interest as a peg upon which to hang any economic regulation. *See Estell v. City of Birmingham*, 291 Ala. 680, 286 So.2d 872, 876 (1973) ("the mere fact that the public have an interest in the existence of the business, and are accommodated by it, cannot be sufficient, for that would subject the stock of the merchant, and his charges, to public regulation.") However, that is not the situation here. It is undisputed that the city in this case, rightly or wrongly, was presented with a specific problem, namely the lack of competition in the Montgomery cable market and the virtual monopoly position of Storer Cable. The city then responded to that problem with an ordinance "designed" to target its source: certain licensing practices of the plaintiffs. *See Estell*, 286 So.2d at 876. ("It has been held that for an occupation or business to be affected with the 'public interest' ... the person so engaged therein must have a virtual monopoly or an oligopoly in the business"). The means chosen by the city to correct this perceived problem may not be the best possible ones, and they may not have their intended effect, but no facts have been offered which suggest that Ordinance 48–90 targets evils "of a remote or highly problematical character" or does not bear a reasonable relation to its presumptive purposes. *City of Russellville*, 382 So.2d at 527.

Turner Network's next argument is also unavailing under state law. The company

contends that Montgomery's mayor and city council enacted Ordinance 48–90, not in the interests of the citizens of Montgomery, but solely to benefit a single cable operator, namely Montgomery Cablevision. Even if this were true, it is a conclusion this court cannot reach within the bounds of the inquiry set by the Supreme Court of Alabama. According to the court: "courts will not inquire into the motives which may have induced authorized legislative action, whether by the legislature of the state or by the municipal council." *Hall*, 421 So.2d at 1247 (quoting *Clements v. Comm'n of City of Birmingham*, 215 Ala. 59, 109 So. 158 (Ala.1926)). "This, it will be observed," the court continued, "is but an elaboration of the rule that bad faith must be apparent upon the face of the act, and cannot be shown by extrinsic fact." *Id.* On its face, Ordinance 48–90 serves the citizens of Montgomery, not Montgomery Cablevision. On their face, the provisions of the ordinance do not favor any cable service provider over any other and apply equally to both Montgomery Cablevision and Storer Cable. The court will not inquire further into the mayor's and the city council's motives or deliberations.

## B. Breach of Franchise Agreement

■■■ Storer Cable contends that, by enacting Ordinance 48–90, the city breached the actual franchise agreements, consisting of Ordinances 101–76 and 67–89, between Storer Cable and the city.[26] As discussed above, the initial cable ordinance, 50–76, guarantees that no amendment to that ordinance or to a franchise agreement "substantially amending the existing rights and obligations of the Grantee shall be adopted without the grantee's consent." Storer Cable contends that, because Ordinance 48–90 impairs its existing rights by requiring it to abandon its exclusive programming arrangements, the ordinance could not have been passed without its consent.

Storer Cable has not identified how its franchise agreement protects its licensing practices and has not proffered any provi-

---

**26.** *See* note 1, *supra.*

sions of its franchise agreement which would be affected by Ordinance 48–90. The company makes the overly simplistic argument that, because prior to the passage of Ordinance 48–90, it could freely engage in exclusive licensing and now, under Ordinance 48–90, it cannot, its "rights" have been abridged. It is apparent that Storer Cable is misreading Ordinance 50–76. The ordinance's reference to the "existing rights and obligations of the Grantee" refers to a grantee's contractual rights under its franchise agreement. If the phrase referred to any "right" of a grantee, as Storer Cable seems to contend, then the ordinance would not merely protect a franchisee's rights under its franchise agreement from unilateral amendment, but would also immunize a cable franchisee from municipal regulations.

The pivotal point is not that Ordinance 48–90 proscribes, in § 5, certain business practices, but rather that one of the remedies it provides to the city for a violation is the ability to terminate the breaching party's franchise. It is this provision which makes Ordinance 48–90 not only a regulatory statute but also an amendment to the franchise agreement. However, neither party has addressed this point. Additionally, neither party has provided guidance as to how the court should determine whether the amendment is "substantial."

Because the court cannot resolve these issues on the present record, summary judgment on this claim will be denied to all parties.

### C. Contracts Clause

The plaintiffs also contend that Ordinance 48–90 violates Article I, § 22 of the Constitution of Alabama of 1901 as a law impairing the obligation of contracts.[27] Although the case law interpreting the state contracts clause is extremely scarce, it seems reasonably clear that the Supreme Court of Alabama gives the clause much the same meaning as the federal courts have given the national clause.[28] In addition, the plaintiffs have not argued that the state standard is any stricter than the federal one. For the reasons this court gives later in its discussion rejecting, on the current factual record, the plaintiffs' challenge to Ordinance 48–90 under the federal contracts clause, the court also rejects their challenge under the state contracts clause.

### IV. FEDERAL CONSTITUTIONAL CLAIMS

Because this case cannot be fully disposed of on federal statutory or state-law grounds, the court must reach the federal constitutional issues raised by the plaintiffs. As mentioned above the plaintiffs contend that Ordinance 48–90 violates the commerce clause, the first amendment, and the contracts clause, and is unconstitutionally vague, in violation of the due process clause of the fourteenth amendment. They also contend that Ordinance 9–90 violates the commerce clause and the equal protection clause, and is unconstitutionally vague.

### A. Commerce Clause

On its face, the commerce clause merely grants power to Congress to regulate interstate commerce and does not speak of restricting the power of the states. However, for some time, the Supreme Court has held that the clause also prohibits the states from taking certain actions which affect interstate commerce even when Congress has not acted. *Quill Corp. v. North Dakota,* — U.S. —, —, 112 S.Ct. 1904, 1911, 119 L.Ed.2d 91 (1992); *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 87, 107 S.Ct. 1637,

---

**27.** Section 22 provides that:

"no ex post facto law, nor any law, impairing the obligation of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment."

**28.** In *White v. Associated Industries of Ala., Inc.,* 373 So.2d 616, 619 (Ala.1979), the court wrote:
"All contracts are made subject to the implied condition that their performance may be frustrated by a proper exercise of the State's police power. However, the exercise of the power must be for an end benefiting the public and the means utilized must be reasonably adapted to that end."

1648, 95 L.Ed.2d 67 (1987).[29] When a statute is shown to discriminate against or regulate interstate commerce, the burden is upon the state to justify the statute in terms of its actual purpose and the lack of alternative, less burdensome, means. *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); *Dean Milk Co. v. Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951). The plaintiffs contend that the Ordinances 9–90 and 48–90 offend the commerce clause in two ways: (1) by "directly regulating" interstate commerce and (2) by imposing an undue burden on interstate commerce.

### 1. Direct Regulation

■ The plaintiffs' "direct regulation" argument is this: Cable television is a commercial activity of such an interstate character that, while certain aspects of the industry may be amenable to state or local regulation, such as the granting of rights-of-ways and customer service issues, others are so national in scope that any attempt by a state or locality to regulate them will be preempted directly under the commerce clause.

The Supreme Court addressed this issue in *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 128–29, 98 S.Ct. 2207, 2215, 57 L.Ed.2d 91 (1978). There, the plaintiffs, several oil companies, challenged a Maryland statute which prohibited petroleum producers or refiners from operating retail service stations within the state. All the gasoline sold in Maryland was imported into the state by the plaintiffs, and these producers and refiners not only sold their gasoline to local wholesalers and retailers, they also sold directly to the public through their own gas stations. The Maryland statute forced the plaintiffs to divest themselves of their retail business in Maryland, thereby turning the whole retail market over to independent stations. The plaintiffs argued, among other things, that the petroleum market was so national in character that no state had the power to regu-

late it. The Court disagreed and wrote that "this Court has only rarely held that the Commerce Clause itself preempts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods." *Id.* at 129, 98 S.Ct. at 2215 (citing *Wabash St. L. & P.R. Co. v. Illinois,* 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244 (1886) (interstate railroad rates exempt from state regulation); *Cooley v. Bd. of Wardens,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852) (pilotage laws not within exclusive purview of Congress, although state laws governing more "national" aspects of navigation might be)).

The plaintiffs point to a number of cases which they contend support their theory that the commerce clause, by its own force, divides the realm of cable television into "national" and "local" spheres, and that the "national" aspects of cable, which the plaintiffs contend the challenged ordinances implicate, demands such national uniformity that it is not amenable to any state regulation: *see, e.g., United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *Wonderland Ventures, Inc. v. City of Sandusky,* 423 F.2d 548 (6th Cir.1970); *Greater Fremont, Inc. v. City of Fremont,* 302 F.Supp. 652 (N.D.Ohio 1968); *Wells TV, Inc. v. Taylor,* 304 F.Supp. 459 (D.Nev. 1968), *aff'd,* 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed.2d 746 (1970).

Without delving into the question of whether these decisions actually support the propositions for which they are cited, the court notes that the position advocated by the plaintiffs might have had force prior to the passage of the Cable Act in 1984. However, with the act now on the books, the suggestion that local cable ordinances are subject to two rounds of preemption scrutiny, first under the Cable Act and next directly under the commerce clause is insupportable in light of the act's history,

---

**29.** Municipal ordinances and state laws are subject to the same scrutiny under the commerce clause. *See Dean Milk Co. v. City of Madison,* 340 U.S. 349, 353, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951); *Wood Marine Service, Inc. v. City of Harahan,* 858 F.2d 1061, 1064 (5th Cir.1988).

language, and policies.[30]

Prior to the Cable Act's passage in 1984, the regulatory landscape shifted a number of times as the Supreme Court and the FCC attempted to delineate the boundaries of federal and state regulation under the Communications Act of 1934, 47 U.S.C.A. § 151 *et seq.* This history is reviewed in detail by the Second Circuit in *Cable Television v. Finneran,* 954 F.2d 91, 95 (2nd Cir.1992), and will only be briefly reiterated here. When cable television first emerged, the FCC took the position that it lacked the authority under the 1934 Act to regulate the new industry, and cable regulation fell entirely to the states. *Id.* at 95. In 1968, the Supreme Court held that the FCC could regulate cable television, but only in matters "ancillary" to its authority to regulate broadcast television.[31] Otherwise, cable franchising was subject to state control. *Id.* at 95–96.

In the 1970s, both the FCC and the Court further altered their conceptions of the relative boundaries of federal and state regulation. In 1972, the commission attempted a system of dual regulation, with local authorities responsible for selecting franchises subject to FCC standards and with the FCC responsible for the technical aspects of cable communication. By 1978, however, the commission withdrew its oversight over franchising authorities. *Finneran,* 954 F.2d at 96. Similarly, the Supreme Court first expanded the FCC's authority in the early 1970's, only to impose new restraints a few years later. In 1972, the Court held that the "ancillary to broadcast television" regulatory authority of the FCC included regulations designed not only to protect broadcast television but also to promote overall programming diversity.[32] In

1979, however, the Court imposed a significant limitation by holding that regulations which affected local broadcasters' editorial control were beyond the commission's authority under the 1934 Act.[33] *Id.* In 1984, the Supreme Court changed direction again by dispensing with the "ancillary to broadcast television" requirement, and holding that the commission had the power to preempt almost any state or local regulation relating to the cable industry.[34] *Id.* at 97.

Shortly thereafter, Congress passed the Cable Act of 1984. The Cable Act accommodates a sophisticated interaction of federal, state, and local authority. The purposes of the act are not only to "establish a national policy concerning cable communications" but also to "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems." 47 U.S.C.A. § 521. In some areas the act expands the regulatory authority of states and localities at the expense of gains previously made by the FCC. *Finneran,* 954 F.2d at 97. It authorizes states to regulate the direct business relationship between cable operators and subscribers, 47 U.S.C.A. § 552, allows franchising authorities to regulate cable services in a manner consistent with the act, § 544(a), and permits certain kinds of local rate regulation, § 543(f)(1). Finally, it expressly states that preemption of local police powers should not be implied from its terms, § 556, and critical sections of the act carry their own preemption provisions, laying out in detail the interplay between local and federal authority. *See, e.g.,* §§ 531(a), 532(b)(2), 533(d), 541(e), 543(a), 544(a), 544(f). As the court has already shown, various sections of the Ordinance 9–90 and

---

**30.** The plaintiffs also draw a distinction between impermissible "direct" regulations of interstate commerce, which they contend that the ordinance is, and "indirect" regulations, which must pass the "undue burden" test. As the defendants correctly note, this formalistic distinction has been abandoned by the Supreme Court in favor of the multi-faceted analysis engaged in here. *See, e.g., Quill Corp.,* —— U.S. at ——, 112 S.Ct. at 1911–13.

**31.** *United States v. Southwestern Cable Co.,* 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968).

**32.** *United States v. Midwest Video Corp.,* 406 U.S. 649, 669, 92 S.Ct. 1860, 1871, 32 L.Ed.2d 390 (1972).

**33.** *FCC v. Midwest Video Corp.,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979).

**34.** *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

48–90 are permissible local regulations under the Cable Act.

With this background, this court cannot infer from the "dormant" commerce clause, one of the "great silences of the Constitution," *CTS Corp.*, 481 U.S. at 87, 107 S.Ct. at 1648, that the Constitution adopts a particularized view of cable television regulation which may be at variance with that which Congress has so painstakingly constructed. In effect, the plaintiffs are asking the court to employ the commerce clause to second guess Congress's determination as to which aspects of cable television are amenable to local control and which are not. In *Exxon*, the Court declared that "in the absence of a relevant congressional declaration of policy, or a showing of a specific discrimination against, or burdening of, interstate commerce, we cannot conclude that the States are without power to regulate in this area." 437 U.S. at 128–29, 98 S.Ct. at 2215. In this case a relevant and highly detailed congressional declaration of policy is on the books, and section of the challenged ordinances have been found to be consistent with that policy. Therefore, the plaintiffs' argument must fail.

### 2. Undue Burden on Interstate Commerce

When no patent discrimination against interstate trade is evident, the Supreme Court has adopted a "flexible" approach, enunciated in *Pike v. Bruce Church Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

"Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the

nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

*Id.* at 142, 90 S.Ct. at 847 (citation omitted).

 With regard to the challenged ordinances, their presumptive local purposes are taken from their plain language. Ordinance 9–90's anti-price discrimination provision, as interpreted by this court, demands equal prices for like services, which is a legitimate matter of public interest. *American Trucking Assoc., Inc. v. FCC*, 377 F.2d 121 (D.C.Cir.1966), *cert. denied*, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967) (applying 47 U.S.C.A. § 202(a)). Similarly, the promotion of competition is a valid regulatory interest, one presumptively served by the predatory pricing clause. *See Valley Bank of Nevada v. Plus System, Inc.*, 914 F.2d 1186, 1195–96 (9th Cir. 1990). Similarly, the purpose of Ordinance 48–90, as interpreted by this court, is to provide remedies against certain practices which the City of Montgomery believes are inhibiting competition in the cable market.

 In applying the next step of the analysis, the court must identify the benefits served by the ordinances and compare them to the burdens imposed upon interstate commerce to determine if the burdens are "clearly excessive" as a relative matter. At this stage of the analysis, the city cannot rest upon the ordinances' declarations of purpose. "[T]he incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack." *Kassel v. Consol. Freightways Corp., Etc.*, 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (opinion of Powell, J., joined by White, Blackmun, Stevens, J.J.). "Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause."[35] *Id.* Furthermore,

---

**35.** *See also Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) ("When considering the purpose of a challenged statute, this Court is not bound by 'the name, description, or characterization given it by the

legislature or the courts of the state,' but will determine of itself the practical impact of the law") (quoting *Lacoste v. Dept. of Conservation of Louisiana*, 263 U.S. 545, 550, 44 S.Ct. 186, 188, 68 L.Ed. 437 (1924)).

the weighing conducted by the court cannot be cursory. "This 'weighing' by a court requires—and indeed the constitutionality of the state regulation depends on—'a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce.' " *Kassel,* 450 U.S. at 670–71, 101 S.Ct. at 1316 (quoting *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 441, 98 S.Ct. 787, 794, 54 L.Ed.2d 664 (1978) (unanimous opinion)).

■ With regard to the putative benefits of the ordinances, there is a substantial dispute of material facts. The defendants have offered scant evidence to suggest that the ordinances will serve their purported purposes by opening up the Montgomery market to robust competition, thereby ensuring a greater diversity of programming, reduced rates, and better service. The plaintiffs, of course, suggest that the effect of the ordinances will be to actually diminish competition and reduce access to diverse cable programming in Montgomery. They contend that Ordinance 9–90 fully eliminates one form of competition—price competition—from the city, and they also argue that the effect of Ordinance 48–90 will be to either drive Storer Cable out of the market, or at least convince the programmers who have exclusive licenses with Storer Cable that they would rather withdraw their programming from Montgomery rather than be coerced into complying with the law.

On the other side of the scale are the burdens inflicted by these ordinances. According to Storer Cable, the two challenged provisions of Ordinance 9–90 combine to mandate uniform pricing throughout the city, thereby diminishing competition rather than promoting it. Such a mandate they say, "penalizes" Storer Cable and any theoretical cable operator for engaging in price competition in the City. Storer Cable contends that Ordinance 9–90 rises to an unconstitutional burden on interstate commerce because the "ordinance makes the operation of an incumbent cable system economically unfeasible in the City of Montgomery." The company's second theory is that any burdens imposed on it will also result in direct burdens on the interstate flow of programming. If it is deterred from expanding its services in Montgomery, or is even driven from the market, Storer Cable argues, the overall provision of cable programming in Montgomery will be correspondingly diminished. Storer Cable's contentions are, in short, that (1) the ordinance places a cost burden on Storer Cable who is an out-of-state supplier of cable programming "products" and (2), by burdening Storer Cable, the law also burdens the interstate flow of those products themselves.

In evaluating these showings of burdens on interstate commerce, the court finds the case of *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), once again highly relevant. The plaintiff oil companies in *Exxon* invoked many of the same burdens on interstate commerce that the current plaintiffs now raise. They had argued that the Maryland law would cause many of them to withdraw from the Maryland market, which would, in turn, affect the array of services offered to the Maryland consumer. The plaintiffs also complained that the statute changed the market structure by weakening the position of the refiners. *Id.* at 127–28, 98 S.Ct. at 2214–15. The Court, in rejecting these arguments, stressed that "the Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id.* The fact that some refiners may be economically injured, forced to alter their business practices, or even be driven from the market, did not amount to a burden on the interstate market, in the Court's view, so long as the plaintiffs could only demonstrate that at worst, the flow of interstate gasoline into Maryland would simply be rerouted through other carriers. According to the Court, not only does the commerce clause take no interest in "the particular structure of methods of operation in a retail market," *Id.* at 127, 98 S.Ct. at 2215, but "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some

business to shift from one interstate supplier to another." *Id.* at 127, 98 S.Ct. at 2214.

■■■ Applying these principles to this case, the court concludes that the plaintiffs have failed to demonstrate that Ordinance 9–90 imposes any burden on interstate commerce at all. The cost burdens imposed upon Storer Cable as an operator, if true, do not of themselves burden interstate commerce. The fact that Storer Cable itself will be harmed by Ordinance 9–90 or even driven from the relevant market, absent a showing of discrimination (a claim the plaintiffs have not made in the commerce clause context), as the court in *Exxon* noted, relates to the wisdom of the statute, not to its burden on commerce. 437 U.S. at 127–28, 98 S.Ct. at 2215. "A nondiscriminatory regulation serving a substantial state purpose is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry." *State of Minnesota v. Clover Leaf Creamery,* 449 U.S. 456, 474, 101 S.Ct. 715, 729, 66 L.Ed.2d 659 (1981). Therefore, the effects of Ordinance 9–90 on a single out-of-state supplier is irrelevant for commerce clause purposes, so long as the interstate flow of cable programming is not excessively burdened. *See also Wood Marine Service, Inc. v. City of Harahan,* 858 F.2d 1061 (5th Cir.1988).[36]

The Court in *Exxon* also addressed an argument, similar to Storer Cable's, that the flow of interstate commerce is tied to its own viability in the Montgomery market. The Court observed that "Some refiners may choose to withdraw entirely from the market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners." 437 U.S. at 127, 98 S.Ct. at 2214. Similarly, Storer Cable has not presented the court with any reason to doubt that their market share in Montgom-

ery will be promptly filled by other cable operators, some of whom may be in-state companies like Montgomery Cablevision and others who may be from out of state.

Because the plaintiffs have not established the existence of any burden on interstate commerce associated with Ordinance 9–90's implementation, the court need not engage in a balancing of the benefits against the burdens and the factual dispute over the benefits side of equation for this ordinance is therefore irrelevant. *See Wood Marine Service, Inc. v. City of Harahan,* 858 F.2d 1061, 1065 (5th Cir.1988); *Norfolk Southern Corp. v. Oberly,* 822 F.2d 388, 406 (3rd Cir.1987); *Executive Town & Country Serv., Inc. v. City of Atlanta,* 789 F.2d 1523, 1527 (11th Cir. 1986). Ordinance 9–90 does not violate the commerce clause.

■■■ In challenging Ordinance 48–90, the plaintiffs have raised most of the same "burdens" discussed above in relation to Ordinance 9–90, and they are unavailing for the same reasons here. However, there are number of burdens the plaintiff programmers, Turner Network and ESPN, associate solely with Ordinance 48–90. For example, they contend that under Ordinance 48–90 they would no longer be able to draft a single national agreement covering every cable operator but will have to enter into special agreements with those operators doing business in Montgomery. Presumably referring to burdens of this type, Turner Network also contends that, because Ordinance 48–90 bars practices which are legal under federal law and the law of other states, compliance would force it to alter the consistent manner in which it conducts its business on a nationwide basis. The plaintiffs also argue that "exclusivity is the cornerstone of successful programming." According to the plaintiffs, developers of programming such as ESPN and

---

**36.** The court in *Wood Marine Service* upheld a city regulation which re-zoned its harbor area to prohibit the commercial use of its ports. A cargo discharge operator challenged the ordinance, alleging that it prevented the company from doing business in the city. The court found that the burdens complained of fell solely upon the plaintiff rather than upon interstate commerce. As a result, the court had no need to address the "benefits" of the regulation: "That alternative routes will have to be found for the interstate shipment of construction material into Louisiana does not establish the existence of a burden upon interstate commerce." *Id.* at 1065.

Turner Network need large amounts of capital to launch new programs. A major source of funds comes from operators such as Storer Cable who are willing to invest in programming in exchange for the exclusive license to exhibit it. Without this source of financing, the plaintiffs contend, new and diverse programming would never be developed. The plaintiffs also argue that exclusivity creates viewer loyalty, which in turn assists operators in obtaining advertisers, and finally they argue that new programming with few viewers may be broadcast by an operator who is the sole exhibitor in a market but could not be carried profitably in a competitive market.

■■■ The plaintiffs' contention that their internal practices may have to change in light of Ordinance 48–90 does not rise to the level of a burden on interstate commerce under *Exxon.* 437 U.S. at 127, 98 S.Ct. at 2215 (the commerce clause does not protect particular "methods of operation"). The plaintiffs are not being asked to physically alter their products or re-tool their equipment at the city line. *See Kassel v. Consol. Freightways Corp.,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (truck lengths); *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) (state requirements for truck's mudguards); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (railroad car lengths). The court is not convinced that the imposition of additional paperwork rises to the level of a burden on interstate commerce. *See Valley Bank of Nevada v. Plus System,* 914 F.2d 1186, 1192 (9th Cir.1990). It also seems extremely unlikely that the passage of Ordinance 48–90 will lead to the unraveling of the edifice that the plaintiffs contend has been built upon exclusive licensing. The plaintiffs' true fear is that local regulations like Ordinance 48–90 might be passed on a state-wide basis, or even implemented by several states. Such a fear does not implicate the commerce clause so long as the subject matter at issue is amendable to state regulation, as is the case here. *Exxon,* 437 U.S. at 128–29, 98 S.Ct. at 2215. However, it is not proper for the court to weigh the evidence on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Therefore, because the plaintiffs have raised the possibility that Ordinance 48–90, standing alone, will have a corrosive effect on the industry, they will have the opportunity to establish these contentions at trial.

If compliance with the ordinance can be expected to have the consequences the plaintiffs predict, it seems more likely that programmers who do rely on exclusive licensing will simply choose not to do business in Montgomery at all. The plaintiffs also make and support this contention, and the court agrees that it raises a cognizable "burden." Interstate commerce could very well be excessively burdened if Montgomery were to become a blockaded fortress in the sea of interstate cable programming. *See Kassel,* 450 U.S. at 674, 101 S.Ct. at 1318 ("burden" is that interstate truckers will bypass state rather than conform to challenged truck-length regulation). The plaintiffs will be given an opportunity to demonstrate the severity of this burden, and its likelihood of occurrence at trial.

## B. First Amendment

The plaintiffs also challenge the constitutionality of Ordinance 48–90 on a variety of first amendment grounds. They contend that, because they are members of the press and are engaged in speech, the ordinance, by virtue of the fact that it applies only to the Montgomery cable industry, impermissibly "singles out" the press. They also contend that the ordinance's prohibition on exclusive licensing agreements interferes with their editorial discretion, right to speak or refrain from speaking, and freedom of association.

After carefully reviewing the arguments of the plaintiffs, the court concludes that Ordinance 48–90 raises little, if any, first amendment concern. The ordinance, so far as it survives preemption scrutiny, is a legitimate trade practice regulation which may change the manner in which the plaintiffs conduct some of their business dealings, but does not in any way impair ex-

pressive activity or unreasonably "single out" the press for burdensome treatment.

1. "Singling Out" of the Media Claim

 Cable television is, without question, engaged in "speech" under the first amendment and is, in much of its operation, part of the "press." *Leathers v. Medlock*, —— U.S. ——, ——, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991). Defendants also do not dispute that Ordinance 48–90's prohibitions on certain anti-competitive practices do not apply to Montgomery businesses in general but rather only to the conduct of cable television operators and programmers insofar as that conduct affects the provision of cable television services within the City of Montgomery. The plaintiffs rely on these two factors to argue that Ordinance 48–90 constitutes an impermissible "singling out" of the media.

The plaintiffs base their theory upon a line of Supreme Court cases, namely *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), and *Leathers v. Medlock, supra*, that have examined the first amendment implications of state taxation of the press and communications media. In *Minneapolis Star*, the Court invalidated a state use tax which applied only to large scale consumers of paper and ink used in producing publications. The Court established the principle that a tax which is structured so as to amount to a penalty upon a small segment of the press raises concerns about censorship of viewpoints and opinions. The Court struck down the tax even though there was no evidence of improper censorial motive, because, as the Court opined, the threat of exclusive taxation of the press can operate "as effectively as a censor to check critical comment." 460 U.S. at 585, 103 S.Ct. at 1372. In *Arkansas Writers' Project*, a magazine publisher successfully challenged a sales tax which exempted religious, professional, trade, and sports magazines but not the plaintiff's general interest publication from taxation. The Court held that a tax which differentiated among publica-

tions based solely on their content could not withstand first amendment scrutiny. 481 U.S. at 229, 107 S.Ct. at 1727.

More recently, in *Leathers*, the Court clarified the teaching of its "singling out" jurisprudence. In that case, cable operators unsuccessfully challenged a general sales tax which exempted newspaper and magazine sales from taxation and applied to only certain services such as cable television but not scrambled satellite broadcast television. The Court found that the tax did not offend the first amendment, reasoning as follows:

> "These cases demonstrate that differential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints. Absent a compelling justification, the government may not exercise its taxing power to single out the press.... *Minneapolis Star*, 460 U.S., at 585, 103 S.Ct., at 1371. The press plays a unique role as a check on government abuse, and a tax limited to the press raises concerns about censorship of critical information and opinion. A tax is also suspect if it targets a small group of speakers. *Minneapolis Star, supra*, at 575, 103 S.Ct., at 1365; *Arkansas Writers'*, 481 U.S., at 229, 107 S.Ct., at 1727.... Again, the fear is censorship of particular ideas or viewpoints. Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech. [*Arkansas Writers'*, 481 U.S.], at 229–231. 107 S.Ct., at 1727–1729."

*Leathers*, —— U.S. at ——, 111 S.Ct. at 1443–44 (citation omitted). Relying on this authority, the plaintiffs argue that only a "compelling state interest" will justify Ordinance 48–90. The court does not agree.

As the Court stated in *Leathers*, its concern in this line of cases is with censorship and the misuse of state power to exact a penalty upon ideas and viewpoints. While some regulations other than direct taxes may rise to the level of a "penalty" and

therefore justify similar scrutiny,[37] there is no suggestion in these cases that all content-neutral cable regulations must undergo strict scrutiny. *See Minneapolis Star*, 460 U.S. at 585, 103 S.Ct. at 1372 (differential treatment, which is not justified by the special characteristics of the media subject to regulation, suggests that the goal is related to suppression of expression); *Simon & Schuster v. New York State Crime Victims Bd.*, — U.S. —, —, 112 S.Ct. 501, 508–09, 116 L.Ed.2d 476 (1991) (New York law creates financial disincentive to create works with a particular content).

As discussed above, Ordinance 48–90 is thoroughly content neutral, and nothing brought to the court's attention suggests that the ordinance, like the Cable Act itself, is anything other than trade practice legislation prompted by the vagaries of the Montgomery cable market. From 1976 to 1990, Storer Cable was the sole provider of cable services in the city, and, by 1990, at the time of Ordinance 48–90's passage, Montgomery Cablevision represented Storer Cable's only competition in that market. Both Storer Cable and Montgomery Cablevision offer a wide variety of programming, and, more importantly, nothing in the record suggests that either competing operator carries programming that differs systematically in its message or viewpoint from the other. The plaintiffs do not suggest that Ordinance 48–90 evinces either hostility for cable television in general or for the city's preference for a particular franchisee's viewpoints or message. They have offered no evidence which suggests anything other than that the ordinance is directed at Montgomery's cable industry, rightly or wrongly, because of the particular business practices employed by the plaintiffs and their purported effect on Montgomery Cablevision's competitive viability. Whether the ordinance will in fact widen competition in Montgomery's cable market, or even if it tilts the economic playing field in favor of one competitor over another, is beside the point. What is relevant is that the plaintiffs have not pointed to anything relating to the ordinance—that is, its structure, its purpose, its effects, or the circumstances out of which it arose—which gives rise to even the slightest inference of a goal to suppress expression. The ordinance applies to all cable service providers, and the plaintiffs have never suggested that the ordinance relates in any way to the fact that Storer Cable or Montgomery Cablevision communicate ideas. Even differential taxation schemes will not be struck down unless something in their structure or operation gives rise to such an inference. As the Court said in *Leathers:*

"there is no indication in this case that Arkansas has targeted cable television in a purposeful attempt to interfere with its first Amendment activities. Nor is the tax one that is structured so as to raise suspicion that it was intended to do so."

— U.S. at —, 111 S.Ct. at 1444.

The Third Circuit Court of Appeals recently addressed circumstances analogous to those before this court. In *Associated Film Distribution Corp. v. Thornburgh*, 800 F.2d 369 (3rd Cir.1986), *cert. denied*, 480 U.S. 933, 107 S.Ct. 1573, 94 L.Ed.2d 765 (1987), the court was faced with a challenge to a Pennsylvania motion picture trade regulation which prohibited a number of licensing practices commonly engaged in by film distributors within the state. For example, the statute barred distributors from licensing films without allowing exhibitors to view them first, restricted agreements which provided for minimum guaranteed returns for the distributor, and prohibited distributors from granting exclusive licenses to exhibitors for more than 42 days. The distributors argued, like the plaintiffs in this case, that, because the law applied only to film licensing, it should be subject to strict first amendment scrutiny. The

---

**37.** In *Simon & Schuster v. New York State Crime Victims Bd.*, — U.S. —, 112 S.Ct. 501, 116 L.Ed.2d 476 (1992), the Court invalidated on first amendment grounds New York's "Son of Sam" law, which required income from works describing the author's crimes to be placed in a victims' fund. The statute was treated as a content based tax, analogous to the taxation scheme struck down in *Arkansas Writers' Project*, because it "imposes a financial burden on speakers because of the content of their speech." *Id.* at —, 112 S.Ct. at 508.

court disagreed, holding that "This conclusion that the Act was promoted by trade practices associated with the distribution of motion pictures forecloses the argument that the Act was designed to single out the motion picture industry in order to suppress its expressive conduct." "It is only the latter type of differential treatment," the court continued, "that triggers the 'compelling interest' analysis of *Minneapolis Star*." *Id.* at 374. *See also Allied Artists Pictures Corp. v. Rhodes*, 496 F.Supp. 408, 432 (S.D.Ohio 1980) (upholding an Ohio motion picture act similar to Pennsylvania's: "[The Act] is trade practice legislation, directed at the motion picture industry as opposed to other industries, not because that industry communicates ideas, but rather because, as plaintiffs readily acknowledge, the market structure of that industry is unique"), *aff'd in part, remanded in part*, 679 F.2d 656 (6th Cir. 1982).

The plaintiffs' reading of the Supreme Court's taxation cases would lead to strict scrutiny standard for all cable regulations, a position which is as unsupported by the Supreme Court's reasoning as it is undesirable from a practical standpoint. Ordinance 48–90 presents no "fear" of censorship of particular ideas or viewpoints, *Leathers*, —— U.S. at ——, 111 S.Ct. at 1444, and accordingly is not subject to heightened scrutiny under *Minneapolis Star*.

### 2. Other First Amendment Claims

■ The plaintiffs also point to a host of other related ways in which Ordinance 48–90 infringes on protected first amendment activity. The plaintiff programmers contend that, because the ordinance may sanction some of their exclusive licensing agreements and thereby "compel" them to do business with Montgomery Cablevision, they will in effect be required to "speak" or "associate" against their will. Storer Cable conversely argues that, if the programmers withdraw from the Montgomery market rather than comply with the ordinance, it will be deprived of the programming that these suppliers offer. As a result, Storer Cable contends, it will be deprived of the "speech" the programming represents, its "editorial discretion" to broadcast the programming of its choice will be impaired, and its "association" with the programmers will be curtailed. Finally, Storer Cable argues that, because, under § 5 of Ordinance 48–90, violation of the ordinance is ground for terminating its franchise, its right to "speak" to the citizens of Montgomery is impermissibly burdened.

■ The plaintiffs are apparently confusing the burdens which Ordinance 48–90 may place upon their business interests with bona fide first amendment injury. As the Eleventh Circuit pointed out in *Warner Cable Communications, Inc. v. City of Niceville*, 911 F.2d 634 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991), a speaker's first amendment rights and economic viability are not necessarily related: "The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression." *Id.* at 638 (quoting *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 78, 96 S.Ct. 2440, 2456, 49 L.Ed.2d 310 (1976) (Powell, J., concurring)). The plaintiffs have not pointed to any protected first amendment interests which are burdened by Ordinance 48–90. First, there is no right to commercially "associate" or "speak" to suppress competition. As the Supreme Court stated in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982):

"This Court has long recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association.... The right of business entities to "associate" to suppress competition may be curtailed.... Unfair trade practices may be restricted."

*Id.* at 912, 102 S.Ct. at 3425 (citations omitted). *See also Roberts v. United States Jaycees*, 468 U.S. 609, 620, 104 S.Ct. 3244, 3250–51, 82 L.Ed.2d 462 (1984); *id.* at 634, 104 S.Ct. at 3258 (O'Connor, J., concur-

ring);[38] *Rivers v. Campbell,* 791 F.2d 837, 840 (11th Cir.1986).[39] Second, it is well settled that anti-competitive activity is not immunized from trade practice regulation because it is engaged in by members of the communications industry. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 514, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972); *Associated Press v. United States.,* 326 U.S. 1, 19–20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945). Thus, if cable television operators or programmers engage in monopolistic or other anti-competitive conduct, they may be subjected to anti-trust liability, whether federal, state, or local. *See Central Telecommunications, Inc. v. TCI Cablevision,* 610 F.Supp. 891, 898 (W.D.Mo.1985), *aff'd* 800 F.2d 711 (8th Cir.1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1358, 94 L.Ed.2d 528 (1987).[40]

Finally, the plaintiffs' argument that the first amendment is implicated because the franchise of a franchisee who violates Ordinance 48–90 may be terminated is also meritless. In *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), the Supreme Court was confronted with a challenge to a state law which allowed the closure of any building used as a place of prostitution. The owner of a bookstore, which was suspected of being used to solicit prostitution, contended that the sanction of closure infringed upon the bookstore's other, protected, first amendment activities. The Court disagreed and held that, so long as a remedy is meted out

pursuant to a valid statute, does not represent a pretext for the suppression of protected expression, and does not "single out" the media in violation of *Minneapolis Star* and so long as the underlying conduct which drew the sanction was not protected, first amendment values are not offended even if the punishment itself results in the curtailment of protected activities. *Id.* at 706–07 & n. 4, 106 S.Ct. at 3177–78 & n. 4. Ordinance 48–90 meets all of these requirements. The ordinance, as the court has already shown, is a valid exercise of the city's police power, does not impermissibly "single out" the press or media, and sanctions only conduct which is not immunized by the first amendment. Furthermore, as was also discussed above, there no evidence suggesting that the ordinance, or its threatened enforcement against the plaintiffs, is a pretext for the suppression of expression.

Simply put, the ordinance does not prohibit Storer Cable from transmitting whatever programming it wishes, and it does not prohibit the plaintiff programmers from licensing whatever programming they wish to license to Storer Cable. It does not purport to dictate or regulate the contents of any cable programming, and it does not burden anyone for engaging in constitutionally protected activity. While it does prohibit certain commercial practices and "associations" which have been afforded little, if any, first amendment protection,

---

**38.** In *United States Jaycees,* Justice O'Connor wrote:

"there is only minimal constitutional protection of the freedom of *commercial* association. There are, of course, some constitutional protections of commercial speech—speech intended and used to promote a commercial transaction with the speaker. But the State is free to impose any rational regulation on the commercial transaction itself. The constitution does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions, without restraint from the State."

*Id.* (emphasis in original).

**39.** Similarly, in *Rivers,* in rejecting a free-association challenge to prohibition upon food vendors on school property, the Eleventh Circuit wrote:

"[Plaintiff] seeks to associate with the Bay County area school children for commercial gain only. In our view, such 'association' is not entitled to first amendment protection." *Id.*

**40.** The plaintiffs argue that *Associated Press* and *California Motor Transport* are inapplicable because, unlike the antitrust laws at issue in those cases, Ordinance 48–90 is not a law of general applicability but applies only to the cable industry. However, this is nothing more than a re-argument that the ordinance impermissibly "singles out" the media. Because the court has found nothing constitutionally suspect in the fact that Ordinance 48–90 applies only to cable television, there is no basis for the argument that the ordinance falls outside the line of cases which hold that the communications media are subject to content-neutral trade regulation.

the plaintiffs nevertheless retain their unimpeded freedom to communicate whatever it is they wish to communicate to the citizens of Montgomery. If Storer Cable loses some of the programming it desires because its program suppliers choose to leave the market rather than comply with a valid law, "the statute results," at most, "in an infringement upon plaintiff's profits, not its First Amendment rights." *National Market Reports, Inc. v. Brown*, 443 F.Supp. 1301, 1304 (S.D.W.Va.1978).

### C. Contracts Clause

In addition to their other constitutional claims, the plaintiffs assert that Ordinance 48–90 violates the contracts clause of the United States Constitution by invalidating the agreements in which Storer Cable is the exclusive exhibitor of certain programs in the Montgomery area. Unlike some of the other plaintiffs' other claims, this contention goes to the heart of the factual disputes between the parties and thus the court cannot resolve these questions on the present record.

▋ Article I, § 10, clause 1 of the United States constitution prohibits state laws "impairing the Obligation of Contracts." As is well settled, the clause is not read literally to invalidate all state laws which have the effect of modifying the legal import of private contracts. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 502–03, 107 S.Ct. 1232, 1251, 94 L.Ed.2d 472 (1987). Instead, contracts clause analysis hinges upon distinguishing between legitimate exercises of state police power and illegitimate attacks by the state on the private ordering of contractual obligations and remedies for the benefit, not of society, but of special interests. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412, & n. 13, 103 S.Ct. 697, 705 & n. 13, 74 L.Ed.2d 569 (1983); *Exxon Corp. v. Eagerton*, 462 U.S. 176, 189–91, 103 S.Ct. 2296, 2305–06, 76 L.Ed.2d 497 (1983). As the Supreme Court has explained: "The Contract Clause does not deprive the States of their 'broad power to adopt general regulatory measures without being concerned

that private contracts will be impaired, or even destroyed, as a result.'" *Id.* at 190, 103 S.Ct. at 2305 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977)). Therefore, laws which impose generally applicable rules of conduct designed to advance a "broad societal interest" are of little constitutional concern under the clause, while rules "limited in effect to contractual obligations and remedies" must be examined more closely. *Id.* at 191, 103 S.Ct. at 2306 (citation omitted).

▋ To assist courts in effectuating the values inherent in the contracts clause, the Supreme Court has devised a three-part test for evaluating state laws under the clause. First, the party bringing the constitutional challenge must clearly identify its contractual right which has been impaired and establish the degree of impairment to its contractual relationship. *Keystone Bituminous*, 480 U.S. at 504, 107 S.Ct. at 1251–52. Second, the state has the burden of establishing the law's purpose. *Energy Reserves*, 459 U.S. at 411–12, 103 S.Ct. at 704–05. In conducting the second step of the inquiry, courts employ a "sliding scale" of scrutiny in which the severity of the impairment found in step one increases the level of scrutiny to which the legislation will then be subjected in the step two. *Id.* at 411, 103 S.Ct. at 704. Should the legislation operate to "substantially" impair a contractual relationship, the legislation must be justified by a "significant and legitimate public purpose ... such as the remedying of a broad and general social or economic problem." *Id.* at 411–12, 103 S.Ct. at 704–05 (citation omitted). If the state satisfies the second step, the next inquiry is whether the "adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Keystone Bituminous*, 480 U.S. at 505, 107 S.Ct. at 1252 (quoting *Energy Reserves*, 459 U.S. at 412, 103 S.Ct. at 704) (alterations in original). Unlike in the second step, the court in the third step, when private contracts are involved, should "properly defer to legislative judgment as to the necessity and

reasonableness of a particular measure." *Keystone Bituminous*, 480 U.S. at 505, 107 S.Ct. at 1252 (quoting *Energy Reserves*, 459 U.S. at 413, 103 S.Ct. at 705). Therefore, regardless of the level of scrutiny employed in determining a statute's purposes, the legislature's choice of means must only be reasonable in relation to those goals. *See Ass'n of Surrogates v. State of N.Y.*, 940 F.2d 766, 771 (2nd Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992).

### 1. Degree of Impairment

 First of all, for the purposes of this analysis, the court will assume that Ordinance 48–90 does act to ban the components of the plaintiffs' licensing agreements which grant Storer Cable the exclusive rights to exhibit certain programming.[41] Even with this assumption, however, there is a significant factual dispute over the importance of these exclusivity clauses to the plaintiffs' overall contractual relationships. The plaintiffs have introduced testimony to the effect that, "In many cases, exclusivity is the cornerstone of successful programming because it establishes image and desirability, viewer habit and loyalty, and predictability for advertisers." However, the plaintiffs have failed to present a detailed portrait of how critical the exclusivity provisions are to the contracts and relationships at issue in this case. Without this information the court cannot determine just how substantial a part of the contracts the exclusive licensing provisions are. *See Keystone Bituminous*, 480 U.S. at 504 n. 31, 107 S.Ct. at 1252 n. 31. The defendants, in this regard, point to the terms of the contracts themselves to demonstrate that the exclusivity provisions were not crucial elements of the parties' agreements. For example, they submit that the contracts make no mention

of extra consideration paid in exchange for the exclusivity rights and that the contracts are completely severable, indicating that overall contractual relationships would be only marginally affected by the potential invalidation of the exclusivity provisions. Additionally, the defendants have raised the inference that the exclusive agreements were executed in haste because the plaintiffs were fully aware of pending federal legislation which would have barred their enforcement. *See Energy Reserves*, 459 U.S. at 411, 103 S.Ct. at 704 ("state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment.") A more developed factual record is necessary before the court can fully evaluate how much Ordinance 48–90 upset the plaintiffs' reasonable expectations and the degree of impairment the ordinance imposes upon the contractual relationships in question.

### 2. Ordinance's Purpose

Because the degree of impairment determines the level of scrutiny applied to the statute's purpose, the court at this point cannot accurately evaluate the ordinance's justifications. For example, should the level of impairment be relatively slight, the court would be compelled to accept the ordinance's proffered statements of purpose. In contrast, a higher level of scrutiny would demand that the court look behind the city's purported purposes and seriously entertain the plaintiffs' allegations that Ordinance 48–90 was not intended to serve broad interests but rather was meant to break up previously valid contractual relationships in order to favor a particular party who had been excluded. These allegations go to the very heart of the contract clause's protections. *See Energy Reserves*, 459 U.S. at 412, 103 S.Ct. at 705 ("The

---

**41.** The parties are, of course, not in agreement on this point. Echoing their disagreements throughout this case, the plaintiffs again contend that the ordinance is a per se ban on exclusive programming licenses and thus unquestionably applies to their agreements. The defendants contend, for the purposes of this contracts clause challenge that, because the ordinance bars only agreements which restrain

trade, the ordinance may not apply to the plaintiffs' agreements at all. However, the defendants' position is not altogether genuine. Their counterclaim specifically alleges that these agreements violate Ordinance 48–90. Additionally, they cannot dispute that the existence of these particular licenses is what prompted the enactment of Ordinance 48–90 in the first place.

requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests").[42] Should exacting scrutiny be necessary, it would best be conducted at trial.

### 3. Ordinance's Relation to its Public Purpose

Similarly, the court cannot evaluate the reasonableness of the means by which Ordinance 48–90 achieves its purposes when its purposes have not yet been established.

### D. Due Process Clause

■ The plaintiffs claim that Ordinances 9–90 and 48–90 violate the due process clause because they are too vague. This argument does not require extended discussion. "To find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'" *Seniors Civil Liberties Ass'n, Inc. v. Kemp*, 965 F.2d 1030, 1036 (11th Cir.1992), (quoting *Boutilier v. INS*, 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967)). In *K–S Pharmacies, Inc. v. Amer. Home Products Corp.*, 962 F.2d 728 (7th Cir.1992), the Court of Appeals for the Seventh Circuit considered a vagueness challenge to a Wisconsin statute which barred sellers of pharmaceuticals from engaging in price discrimination.[43] The reasoning of that court is particularly applicable to this case:

"Is Wisconsin's law vague? Of course it is. No statute so compact as § 100.31(2) resolves a fraction of the problems that attend any attempt to regulate price differences. Weighty treatises on the Robinson–Patman Act attest to the many subtle issues that arise.... Is Wisconsin's law unconstitutionally vague? Of course it is not. It is no worse than the Robinson–Patman Act itself, which resolves few of the many questions ... so vital to implementation.... If § 100.-31(2) is unconstitutionally vague, then the entire common law is unconstitutional because courts revise this non-text as they go along, and all laws calling for "reasonable" behavior in one another fashion are forbidden. Yet for centuries courts have thought it sufficient that specificity may be created though the process of construction. Clarity via interpretation is enough even when the law affects political speech ... Section 100.-31(2) sets an intelligible benchmark (no price discrimination) and leave the details to be worked out."

*Id.* at 732. As discussed above, the disputed language of Ordinances 9–90 and 48–90 is lifted substantially from federal statutes whose constitutionality is beyond dispute— for example, the Robinson–Patman and Clayton Acts, 15 U.S.C.A. §§ 13,[44] 13a,[45] 14[46]; the Sherman Act, 15 U.S.C.A. §§ 1,

---

**42.** *See also id.* at 412 n. 13, 103 S.Ct. at 705 n. 13 (distinguishing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), where the Court had struck down a state pension law because the law narrowly focused on the employment contracts of specific employers); *Keystone Bituminous*, 480 U.S. at 503 n. 30, 107 S.Ct. at 1251 n. 30 (describing the core value of the contracts clause as follows: "It was made part of the Constitution to remedy a particular social evil—the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts—and thus was intended to prohibit States from adopting as [their] policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them.") (quoting dissent in *Spannaus*, 438 U.S. at 256, 98 S.Ct. at 2728 (Brennan, J. dissenting) (alteration in original)).

**43.** The statute read in pertinent part:

"Every seller shall offer drugs from the list of therapeutically equivalent drugs published by

the federal food and drug administration to every purchaser in this state, with all rights and privileges offered or accorded by the seller to the most favored purchaser."

Wis.Stat. § 100.31(2).

**44.** "It shall be unlawful ... to discriminate in price between different purchasers ... where the effect of such discrimination may be substantially to lessen competition or ... to injure destroy or prevent competition."

**45.** "It shall be unlawful ... to sell or contract to sell goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor."

**46.** "It shall be unlawful for any person ... to lease or make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller,

2 [47]; and 47 U.S.C.A. § 202(a).[48] *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972). The challenged ordinances set the same "intelligible benchmarks" as the federal statutes they are modeled upon, and this court therefore concludes that they are not unconstitutionally vague in violation of the due process clause.

### E. Equal Protection Clause

■ The plaintiffs attack Ordinance 9–90 on equal protection grounds. Their arguments take two different tacks. First, they argue that the ordinance, though neutral on its face, treats Storer Cable differently from the "similarly situated" Montgomery Cablevision by prohibiting competitive conduct that only Storer Cable, as the incumbent cable operator, is interested or capable of pursuing. Second, they argue that the ordinance, by applying only to cable television service providers, is under-inclusive, that is, it does not apply to other elements of the media.

■ Neither of these arguments has merit. The first, that Ordinance 9–90 has a disparate effect on Storer Cable, is frivolous. As discussed above, the ordinance bans price discrimination and predatory pricing practices in the provision of cable services. Although the court may accept Storer Cable's contention that it is the only cable operator in Montgomery with the market power to engage in such practices, it certainly does not follow that the equal protection clause bars the city of Montgomery from banning them. Ordinance 9–90 does not create any "suspect" classifications; in fact it does not create any classifications within the cable industry at all. *See Pyler v. Doe,* 457 U.S. 202, 216–17 & n.

14, 102 S.Ct. 2382, 2394–95 & n. 14, 72 L.Ed.2d 786 (1982). It may have a greater impact on Storer Cable, but all laws which proscribe certain activities burden those who wish to engage in them more heavily than those who do not. The ordinance also does not impinge on a "fundamental right." Not only do businesses not have a "fundamental right" to engage in anti-competitive trade practices, the legislature certainly has a legitimate interest in curtailing them. *FTC v. Superior Court Trial Lawyers Association,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Given the circumstances of the Montgomery cable market in 1990, the city certainly could have reasonably and rationally viewed price discrimination and predatory pricing by Storer Cable as a threat to the interests of the citizens of Montgomery. Ordinance 9–90 appears to serve as a reasonable remedy for this perceived harm. *See Pennell v. City of San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 859, 99 L.Ed.2d 1 (1988) ("we will not overturn [a statute that does not burden a suspect class or a fundamental interest] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational") (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979)) (alteration in original).

The plaintiffs' second argument, that Ordinance 9–90 should be subject to "strict scrutiny" under the equal protection clause because it burdens a fundamental right by facially singling out one segment of the media for special treatment is simply a rehashing of the plaintiffs' first amendment contentions with regard to Ordinance 48–90. Admittedly, the *Minneapolis Star*

---

where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

**47.** Section 1 provides that "Every contract, combination in the form of trust or otherwise or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." Section 2 provides that "Every person who shall monopolize, or attempt to monopolize, or combine or

conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony."

**48.** "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges ... or to make or give any undue or unreasonable preference or advantage to any particular person."

line of cases "lie at the intersection of the First Amendment's protection of free speech and the Equal Protection Clause's requirement that government afford similar treatment to similarly situated persons." *News America Pub., Inc. v. FCC,* 844 F.2d 800, 804 (D.C.Cir.1988).[49] However, this does not mean that the plaintiffs get two bites at the apple. Either a law creates an impermissible burden on a class of speakers under *Minneapolis Star* and its progeny or its does not. The reasons the court gave in deflecting a first amendment challenge to Ordinance 48–90 apply equally to Ordinance 9–90. Ordinance 9–90 will therefore, not be subjected to strict scrutiny, and a "compelling justification" will not be demanded of it.

Accordingly, for the above reasons, it is the ORDER, JUDGMENT, and DECREE of the court that the motions for summary judgment filed by the parties on February 25, 1991, January 4, 1991, and December 17, 1990, are granted in part and denied in part to the extent that it is DECLARED as follows:

(1) The court has subject-matter jurisdiction over the plaintiffs' federal and state claims.

(2) The eleventh amendment to the United States Constitution is not a bar to the plaintiffs' state-law claims.

(3) Section 7 of City of Montgomery Ordinance 48–90, to the extent it raises a presumption that exclusive licensing contracts are illegal, is preempted by the Copyright Act, 17 U.S.C.A. §§ 101, *et seq.;* otherwise, Ordinance 48–90 is not preempted by the act.

(4) Ordinance 48–90 is not preempted by the copyright clause of the United States Constitution.

(5) Ordinance 48–90 is not preempted by the Lanham Act, 15 U.S.C.A. §§ 1051, *et seq.*

(6) The following language from City of Montgomery Ordinance 9–90 is preempted,

except to the extent that it applies to basic cable service, by the Cable Communications Policy Act of 1984, 47 U.S.C.A. §§ 521, *et seq.:*

"No rate established shall afford any undue preference or advantage among subscribers, but separate rates may be established for separate classes of subscribers and rates may reflect the increased cost of providing service to isolated or sparsely populated areas."

The following additional language from Ordinance 9–90 is preempted by the act:

"In no event shall rates be established so low for any class of subscriber or for any geographic location as to prevent, discourage, restrict, or diminish competition in the furnishing of cable services."

Otherwise, Ordinance 9–90 is not preempted by the act.

(7) Ordinance 48–90 is not preempted by the Cable Communications Policy Act of 1984, 47 U.S.C.A. §§ 521, *et seq.*

(8) Ordinance 48–90 is not preempted by the Sherman Act, 15 U.S.C.A. §§ 1, 2.

(9) Ordinance 48–90 was properly enacted pursuant to Alabama Code 1975 § 11–45–1.

(10) Ordinance 9–90 does not violate the commerce clause in the United States Constitution.

(11) Ordinance 48–90 does not violate the first amendment to the United States Constitution.

(12) Ordinances 9–90 and 48–90 do not violate the due process clause in the fourteenth amendment to the United States Constitution.

(13) Ordinance 9–90 does not violate the equal protection clause in the fourteenth amendment to the United States Constitution.

**49.** *See also Burson v. Freeman,* —— U.S. ——, —— n. 3, 112 S.Ct. 1846, 1850 n. 3, 119 L.Ed.2d 5 (1992) ("Content-based restrictions also have been held to raise fourteenth amendment equal protection concerns because, in the course of regulating speech, such restrictions differentiate between types of speech").